UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 0:23-CV-61703-AHS

CHG MEDICAL STAFFING, INC.,
       *Plaintiff*,
-vs-

RACHEL SHAFER et al.,
       *Defendants*.
_____/

## RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Defendant, Rachel Shafer ("Ms. Shafer" or "Defendant"), files this response in opposition to Plaintiff CHG Medical Staffing Inc. ("CHG" or "Plaintiff")'s motion for a preliminary injunction [ECF 12].

**RESPONSE**

Defendant incorporates the introduction and memorandum on its motion to dismiss, [ECF 35], (the "MTD"), and asks this Court to deny Plaintiff's request for a preliminary injunction.

Of additional importance to this motion, Defendant asks this Court to take notice that on October 20, 2023, Ms. Shafer's employment with AHS STAFFING, LLC - the other Defendant - was terminated, and presently Ms. Shafer is unemployed.

Ms. Shafer signed the noncompete agreement on July 26, 2012. [ECF 1-2 at 2]. However, Ms. Shafer has been working as a nurse recruiter for the last 17 years. Thus, prior to 2012, when Ms. Shafer signed the noncompete agreement, she had been a nurse recruiter for at least 6 years. So, Plaintiff's contention that "Shafer and Rossi had no experience in the travel nurse staffing industry before their hires at RNN, they were given specialized training to enable them to do their jobs," [ECF 12 at 2], is false or misleading. Ms. Shafer was a trained nurse

1

recruiter before she signed the noncompete. As such, there was no "specialized training," to Ms. Shafer in 2012, and hence the noncompete agreement does not protect a legitimate business interest.

While Ms. Shafer was working for CHG she was paid a salary plus commission. Her commission payments were directly tied to the "bill rates, specialties, shift preferences, placement," of the nurses, [ECF 12 at 4], and the "date of their current placement, the state and location of their current placement, their shifts and hours per shift, the facility client where each nurse is working, bill rates, gross margins for each separate nurse placed, assignment end dates and durations, provider contact information, whether the contract was new, renewed or extended," [ECF 12 at 11]. Thus, Plaintiff's contention that Ms. Shafer took this information to gain "an unfair competitive advantage in the industry," omits the more obvious and legitimate reason Ms. Shafer routinely received and used this information, namely, to keep track of the commissions she was to receive for those nurses she recruited.

In fact, even after Ms. Shafer's employment was terminated, CHG continued to email to Ms. Shafer's personal email account the very same lists containing those details, as it was both Ms. Shafer and CHG's understanding that Ms. Shafer has a legitimate need for that information to ensure she receives the proper commission.

For example, on May 1, 2023, more than a month *after* Ms. Shafer's employment was terminated with CHG, Mary Coombs, a Payroll Specialist from CHG Financial Operations sent an email to Ms. Shafer's personal gmail account with the same "Gross Margin Details," spreadsheet. This is the very same spreadsheet Plaintiff alleges that Ms. Shafer surreptitiously emailed herself prior to her employment termination. [ECF 1 at 20-21]. This goes to show that these allegations of Ms. Shafer's ill intentions are made out of thin air. Indeed, Plaintiff takes a

legitimate commission report used by Ms. Shafer to reconcile her earned commission, which was ***sent to her by CHG even after*** her employment was terminated, and turns it into a nefarious scheme to steal trade secrets from Plaintiff.

In fact, on numerous occasions Ms. Shafer used these reports to demonstrate improper deductions to CHG, and ultimately ended up receiving refunds for these improper deductions. For example in an email dated April 7, 2023, Keela Briles, from CHG Employee Relations, sent to Ms. Shafer's personal gmail account a manual credit of $9,456 to Ms. Shafer's commissions acknowledging that it had been improperly deducted. This payment discrepancy was only discovered by Ms. Shafer from her reviewing of the spreadsheets provided to her by CHG.

Lastly, the "anonymous caller" Plaintiff relies on – if such a person even exists – is a blatant liar.  Ms. Shafer did not "solicit[] and place[] at AHS 43 nurses with whom she was working at RNN," and the statement that "Shafer has 80 nurse candidate submissions per week," [ECF 12 at  10], is a demonstrably provable lie.

   I.   **Legal Standard**

Although Plaintiff outlined in its Motion to Dismiss that substantive Utah law applies, when dealing with a preliminary injunction, this Court must apply federal procedure. *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1448 (11th Cir. 1991) ("we apply federal procedure to determine whether the preliminary injunction was properly issued."), and applying "traditional federal equity practice." *Id.*  "Federal law, however, would allow preliminary injunctions to issue only when the moving party can establish: (1) There is a substantial likelihood that he or she ultimately will prevail on the merits of the claim; (2) he or she will suffer irreparable injury unless the injunction issues;  (3) the threatened injury to the movant outweighs whatever damage

3

the proposed injunction may cause the opposing party; and (4) the public interest will not be harmed if the injunction should issue." *Id.*

"A preliminary injunction is an 'extraordinary and drastic remedy.'" *Vendr, Inc. v. Tropic Techs., Inc.*, No. 2:23-CV-165-DAK-DAO, 2023 WL 3851838, at *4 (D. Utah June 6, 2023), therefore, a Plaintiff's "right to relief must be clear and unequivocal." *Id.* (quoting *SCFC LLC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991)); *see also Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011) ("a preliminary injunction in advance of trial is an extraordinary remedy").

Additionally, "courts should be especially cautious when granting an injunction that requires the nonmoving party to take affirmative action." *RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1208 (10th Cir. 2009); *see also Burgos v. Univ. of Cent. Fla. Bd. of Trustees*, 283 F. Supp. 2d 1268, 1271 (M.D. Fla. 2003) ("A mandatory preliminary injunction requiring defendant to take affirmative action is proper only in 'rare instances.'"). "Certain types of preliminary injunctions are disfavored: (1) preliminary injunctions that alter the status quo, (2) mandatory preliminary injunctions, and (3) preliminary injunctions that give the movant all the relief it would be entitled to if it prevailed in a full trial. When a disfavored injunction is sought, the modified likelihood-of-success-on-the-merits test, is not appropriate—a movant must demonstrate a substantial likelihood of success on the merits, in addition to the other elements.. Under the modified test, a movant need only show questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation." *Siegal* at 1209 n.3.

## II. Plaintiff fails to show a substantial likelihood of success.

As an initial matter, Plaintiff must demonstrate under Utah law that it has an enforceable covenant not to compete agreement. But under Utah law, an agreement that "interfere[s] with the delivery of medical services," is "strongly disfavored," *Scenic Aviation, Inc. v. Blick*, 2:02-CV-01201 PGC, 2003 WL 26060445, at *8 (D. Utah Aug. 4, 2003), especially when it restricts the Defendant from operating "anywhere in the United States." *Sys. W. Performance, LLC v. Farland,* 2:14-CV-00276-DN-BCW, 2015 WL 4920962, at *3 (D. Utah Aug. 18, 2015); *Blick* at *9.

Furthermore, under Utah law, "Covenants not to compete which are primarily designed to limit competition or restrain the right to engage in a common calling are not enforceable." *Robbins v. Finlay*, 645 P.2d 623, 627 (Utah 1982). Plaintiff cannot demonstrate a substantial likelihood of success to enforce a noncompete agreement against a nurse recruiter under Utah law. Utah Courts have specifically found that "medical staffers," do not possess any 'unique, special, or extraordinary' skills sufficient to justify a restraint on their future employment." *Blick*, 2003 WL 26060445, at *6-7 (relying on *Robbins*).

Additionally, Plaintiff also cannot demonstrate a substantial likelihood of success that its two spreadsheets, Working and Awaiting and Gross Margin Detail, satisfy the definition of trade secrets. Plaintiff in its own motion readily acknowledges that with some "time and resources" "any competitor [could] reconstruct or create this information." [ECF 12 at 18]. Indeed, under Utah law, "[w]here information alleged to be a trade secret can be readily ascertained by performing a basic research task, the information does not qualify as a trade secret." *CDC Restoration & Const., LC v. Tradesmen Contractors, LLC*, 274 P.3d 317, 326 (Utah Ct. App. 2012). More specifically, Courts found identical "spreadsheets" do not qualify as trade secrets. *Nursing Enterprises, Inc. v. Marr*, 719 So. 2d 524 (La. Ct. App. 1998) ("nurse lists," are not

5

trade secrets because defendant "had a personal relationship with many of these nurses and one could expect the nurses to follow [her] if they were being treated well by her and the company with which she was associated. In addition, these nurses were not exclusive to one agency. [N]urses usually signed on with more tha[n] one agency to ensure they had consistent work. Finally, [defendant] was a member of an organization through which she could receive a list of all nurses in the state. ... [and] the names and numbers of the hospitals and other medical providers is easily accessible through the local telephone book.").

Lastly, Plaintiff's allegations are based on an "anonymous caller," and vague text messages that are circumstantial evidence at best. "Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007). This is especially the case here where Plaintiff seeks to alter the status quo, require Defendant to take affirmative action, and essentially obtain all the relief it would be entitled to if it prevailed in a full trial. Certainly, these anonymous sources and vague text messages are a far cry from making "the issues ripe for litigation" *Siegal,* 552 F.3d at 1209 n.3.

Thus, Plaintiff has failed to demonstrate a substantial likelihood of success, and its motion must be denied. *Bloedorn*, 631 F.3d at 1229 ("If [Plaintiff] is unable to show a substantial likelihood of success on the merits, we need not consider the other requirements").

### III. Plaintiff fails to demonstrate irreparable injury

"A showing of irreparable injury is 'the sine qua non of injunctive relief.'" *Blue-Grace Logistics LLC v. Fahey*, 340 F.R.D. 460, 465 (M.D. Fla. 2022) (quoting *Siegel*). "A showing of irreparable injury must be 'neither remote nor speculative, but actual and imminent.'" *Id.* (quoting *Ne. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d

1283, 1285 (11th Cir. 1990)). Furthermore, "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Id.* "Generally, in competition cases, the plaintiff's injury can be remedied with monetary damages." *Bansbach Easylift of N. Am., Inc. v. Reve*, No. 608CV1907ORL22GJK, 2009 WL 10670230, at *5 (M.D. Fla. Mar. 25, 2009) (citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1310 (11th Cir. 1998)).

Plaintiff has failed to demonstrate non-speculative, actual imminent harm. In its complaint it admittedly alleges that its "damages [are] not yet known at this time." [ECF 1 at 27].

Furthermore, Plaintiff has failed to allege that its losses cannot be undone through monetary remedies to justify equitable relief. The type of damages alleged by Plaintiff, namely "loss of business, loss of its confidential and trade secret information, loss of reputation and client goodwill," [ECF 1 at 27], have been specifically found insufficient to constitute irreparable harm to justify an injunction. *See Bansbach Easylift of N. Am., Inc. v. Reve, N*o. 608CV1907ORL22GJK, 2009 WL 10670230, at *5 (M.D. Fla. Mar. 25, 2009) ("where the injury Bansbach N.A. stands to suffer is competition from NSC through the defendants' use of allegedly misappropriated trade secrets, its injury is not irreparable because it can be compensated by examining NSC's profits"); *Salsbury Lab'ys, Inc. v. Merieux Lab'ys, Inc.*, 735 F. Supp. 1537, 1543–44 (M.D. Ga. 1987) ("the court can award monetary damages to compensate for lost sales and the misappropriation of trade secrets by former Salsbury employees. Although Salsbury also complains of injury to its image and reputation among its customers, at least one court of appeals has held that loss of 'goodwill and untold customers' is speculative and does not constitute irreparable harm.").

In its motion, Plaintiff erroneously claims that irreparable injury must be presumed, and the burden shifts to the employees to establish the absence of any injury, relying on Fla. Stat. §

542.335(1)(j) and other "Florida" case law to support a presumption of irreparable injury. However, in this case, Utah law applies, not Florida law, and regardless, "the Court must follow federal equity practice if a clash with Florida's standards for granting an injunction is unavoidable." *Fahey*, 340 F.R.D. at 465.  And a "presumption" of irreparable harm is "contrary to traditional equitable principles." *Id.* at 466 (citing *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)).

Plaintiff has neither plead, nor proven any irreparable harm, much less, harm that cannot be undone through monetary remedies. Instead Plaintiff merely relies on a Florida law presumption.  But Florida law does not apply here, and under Federal law, such a presumption is "contrary to traditional equitable principles." *Fahey* at 466.

Lastly, Plaintiff cannot demonstrate any alleged injury is *imminent*.  Ms. Shafer's employment was subsequently terminated, and as an unemployed individual, she cannot possibly cause any imminent harm to Plaintiff.

## IV.   The injury to Ms. Shafer outweighs the damages to CHG.

"[T]he harm considered by the district court is necessarily confined to what might occur in the interval between ruling on the preliminary injunction and trial on the merits." *Nat'l Staffing Sols., Inc. v. Sanchez*, 626 F. Supp. 3d 1247, 1254 (M.D. Fla. 2022).

Here, this Court must consider the harm Plaintiff seeks to cause to Ms. Shafer by preventing her working in the entire United States in her only field that she has worked for the last 17 years, namely, nurse recruiting.  Ms. Shafer has a family to support, and she is unable to do so without working in the area she has worked her entire adult life. On the other hand, Plaintiff, a multi-million-dollar company, cannot demonstrate any actual harm, and in fact

self-admits "damages [that are] not yet known at this time." [ECF 1 at 27]. As such, the balance of equities clearly weighs in favor of Defendant.

Additionally, this Court must consider the extreme invasive measure of turning over all of her "computers, computer hard drives, or memory devices and all other Devices in their possession that reasonably could contain the confidential information and trade secrets at issue (including any smart phones, tablets, desktop computers, laptop computers, and disks, memory files, flash drives, hard drives, and the like) to be imaged, searched and wiped." [ECF 12 at 22]. *See All Star Recruiting Locums, LLC v. Ivy Staffing Sols., LLC*, No. 21-CV-62221, 2022 WL 2340997, at *20 (S.D. Fla. Apr. 8, 2022) (finding that Plaintiff has failed to allege "exceptional circumstances," to justify seizure of computers when "Plaintiff has failed to demonstrate that Defendants are unlikely to comply with this Court's order").

Plaintiff essentially seeks the entire trifecta outlined in *Siegal,* 552 F.3d at 1208, namely, (1) alter the status quo, (2) mandatory and (3) all the relief it would be entitled to if it prevailed in a full trial. Such injunctions are strongly disfavored, and only issued when everything is "ripe for litigation." This is a far cry from the anonymous callers, and vague text message factual allegations Plaintiff's complaint relies on.

V. **Public policy favors denial**

Under Utah law, as well as multiple other jurisdictions "Courts have strictly scrutinized covenants not to compete when they interfere with the delivery of medical services." *Blick*, 2003 WL 26060445, at *8 (finding that "[o]ther jurisdictions have been similarly concerned about the public policy ramification of enforcing covenants not to compete that potentially block the delivery of medical services") (collecting cases from Ohio, Idaho, Pennsylvania, and North Carolina).

Plaintiff erroneously relies on 542.335(1)(h), Florida Statutes, and other Florida case law. Here, Utah law applies, not Florida law, and regardless, "the Court must follow federal equity practice if a clash with Florida's standards for granting an injunction is unavoidable." *Fahey*, 340 F.R.D. at 465. Public policy against interfering with the delivery of medical services weighs heavily in favor of denying injunctive relief here.

## VI. Defendant requests a bond

Fed. R. Civ. P. 65(c) provides in pertinent part:

> the court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained

Additionally, when a Defendant asks for a bond "absent extraordinary circumstances, the court errs in not granting it." *Reinders Bros. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 54 (7th Cir. 1980).

Here, in the event Plaintiff erroneously obtains an injunction, Ms. Shafer will sustain serious damages. In its own Complaint, Plaintiff alleges that "In 2022, RNN paid Shafer in excess of $615,411 in salary and commissions." [ECF 1 at 8].

In the event the Court grants Plaintiff's motion, and enjoins Ms. Shafer from working for the next 12 months, Plaintiff shall be required to post a bond of at least $615,411, which are the likely damages such an injunction will cause.

## CONCLUSION

WHEREFORE Ms. Shafer respectfully requests this Court deny Plaintiff's request for a preliminary injunction, and provide such other relief as the court deems just and proper.

| | |
|---|---|
| Dated: October 24, 2023 | Respectfully Submitted,<br>Shlomo Y. Hecht, P.A.<br>3076 N Commerce Pkwy<br>Miramar, FL 33025<br>Phone: 954-861-0025<br><br>By: /s/ <u>Shlomo Y Hecht</u><br>Florida State Bar No.: 127144<br>Email: sam@hechtlawpa.com<br>*Attorney for Defendant Rachel Shafer* |

**CERTIFICATE OF TRANSMITTAL / SERVICE**

I HEREBY certify that on October 24, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which served this document upon Plaintiff's counsel of record.

/s/Shlomo Y. Hecht
Shlomo Y. Hecht