IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 23-61703-CIV-SINGHAL/VALLE

CHG MEDICAL STAFFING, INC.
d/b/a RNNETWORK a Delaware
Corporation,

Plaintiff,

v.

RACHEL SHAFER, an individual,
LISLEY ROSSI, an individual,
AHS STAFFING, LLC, an Oklahoma Limited
Liability Company,

Defendants.

_____/

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff, CHG Medical Staffing Inc. d/b/a RNnetwork ("RNN" or "Plaintiff"), by and through its undersigned counsel, in compliance with the Court's instruction given at the October 31, 2023 injunction hearing, submits its Proposed Findings of Fact and Conclusions of Law in support of its Motion for Preliminary Injunction [D.E. 12], and states as follows:

**PROPOSED FINDINGS OF FACT**

**RNN's Business and the Travel Nurse Staffing Industry**

1.      RNN is a national nurse staffing agency in the business of recruiting, staffing and placing travel nurses with healthcare facilities (*i.e.*, hospitals, clinics, medical practices, long-term care facilities) on a temporary basis, throughout the United States.  **Day 1**[1] **(36:1-6)**.

2.      RNN has been in business for 25 years. **Day 1 (71:23).**

_____

[1] The citations "Day 1 and Day 2" pertain to the Injunction Hearing Transcripts from the October 31 and November 7, 2023 hearings.

3.      RNN's nurse recruiters are responsible for placing nurses in temporary positions nationwide, as well as qualifying them for placements, overseeing the credentialling process, and developing and continuing relationships with nurses. **Day 1 (36:23-25; 39:1-17)**.

4.      The nurse staffing industry is highly competitive with thousands of agencies nationwide, all of which compete with RNN in some or all aspects of its business. **Day 1 (37:6-10).**

5.      The travel nurse staffing industry also is a relationship driven business, and developing relationships with nurses is "the most important part of the [recruiter] job." **Day 1 (37:4-10)**.  Because RNN places nurses on a temporary basis (typically three-month assignments), maintaining strong relationships with nurses is critical to ensure repeat placements and repeat business.  ***Id***.**; Day 2 (131:10-12)**.

6.      To be successful in nurse recruiting, a recruiter must have more than "common sense."  **Day 2 (141:3-7)**.  Recruiters need to be knowledgeable about the industry, nurse specialties, qualifying nurses for open positions, credentialing, negotiating nurse compensation and building their pay packages, as well as knowing state wage and hour laws.  **Day 2 (15:1-18; 141:6-7).**

7.      RNN spends time, money, and effort to develop its nurse recruiters, including providing comprehensive training programs, on-the-job training, training on how to recruit nurses, RNN's internal processes, and general industry knowledge. **Day 1 (41:11-25); Day 2 (15:1-13; 18:3-10)**.

8.      Training throughout a recruiter's employment is particularly important because RNN generally hires recruiters who have no experience in the nurse staffing industry, and laws

they must know, such as state laws for wages and overtime compensation, are always changing. **Day 1 (41:14-25); Day 2 (15:9-13).**

9.      RNN's nurse provider lists and information is valuable to its business, having taken 25 years to develop for more than 400,000 nurses. **Day 1 (71:2-72:19).**

10.     RNN pays money to third party sources to obtain leads for nurse providers who already have indicated an interest in travel nursing. **Day 1 (37:20-22).**  RNN also pays money to various job posting websites, such as CareerBuilder and Indeed.com, to post facility client job postings through which nurses can apply.  **Day 1 (37:16-19).** With the leads generated from these two avenues, RNN's nurse recruiters are able to spend their time trying to make placements of nurses who already have indicated an interest in a travel nursing.  **Day 1 (37:16-25)**.  There is no cold calling involved in the RNN recruiter job.  **Day 1 (38:3-4).**

11.     Once RNN receives nurse leads from these third-party sources, RNN enters the nurses' detailed information into its database and sends it to a recruiter, who then calls the nurse and begins the relationship.  *Id.*  RNN provides its recruiters 10-12 leads a week. **Day 1 (38:3-5)**.

**RNN's Confidential, Propriety Information and Trade Secrets**

12.     RNN has developed a secure database which hosts the Company's confidential, proprietary and trade secret information, including, among other things, the nurse client lists with names, email addresses and telephone numbers of nurses who are interested in travel nursing or who have been placed on assignments with RNN; contract terms including start and end dates of nurse assignments; nurse preferences regarding housing, shifts and compensation; nurse credentials and license information and states of licensure, nurse specialties, lists of facility clients that use travel nursing; bill rates, gross margins, and financial data pertaining to the business. **Day 1 (42:10-16; Plaintiff's Exhibit (***"Pl. Ex."***) 12 and 13**).

13.     RNN has taken affirmative steps to preserve the secrecy of its confidential information and trade secrets.  **Day 1 (107:13-111:17)**.

14.     It mandates that employees enter into confidentiality, non-compete and non-solicitation agreements before giving employees access to its confidential and trade secret information.  **Day 1 (42:20-23; 43:8-13).**

15.     The Company also has implemented several security systems, including OKTA, an identity software, which has a multifactor authentication requiring individuals to use multiple forms of identification to prove the person logging into RNN's systems is an authorized user *before* they enter their username and password.  RNN also uses a program called TextUs for the protection of both its employees and its data, which enables recruiters to communicate with nurse clients through a text messaging system that flows through the protected Bullhorn database so that the text messages are saved in the database, recruiters' personal cellphone information is not disclosed, and nurse client information is saved in RNN's system – even when recruiters use their personal cell phones to communicate with the nurse clients.  RNN also has implemented a variety of data theft software programs to identify data breaches, software that scans the system for large data deletions or records being transferred out of the system, it has an IT department with a privacy and security division, as well as security systems, cameras, badges for office access, locked file cabinets and limited access throughout the database.  **Day 1 (42:22-43:7, 107-111)**.

16.     RNN employees who have access to RNN's database have the ability to generate various lists and spreadsheets of select information contained in the database using filters and "clicking a few buttons." **Day 1 (71:15-19)**.

17.     Defendant Rachel Shafer ("Shafer) had access to RNN's database throughout her employment.  **Day 1 (42:10-16)**.

**<u>Shafer's Employment with RNN</u>**

18.     RNN hired Shafer in 2006.  She voluntarily resigned in 2008 or 2009 to work as a nurse and was re-hired by RNN in 2012 as a full-time nurse recruiter.  **Day 1 (43:14-22); Day 2 (73:7-12, 74:25-75:4)**.

19.      At the time of her hire in 2006, Shafer did not have any experience in the staffing or recruiting industry. Shafer learned about the industry and developed her skills as a nurse recruiter through her employment at RNN.  **Day 1 (40: 17-20); Day 2 (75:23-25, 124:18-23).**

20.     Before she was given access to RNN's confidential information and trade secrets, and as a condition of her employment with RNN, Shafer was required to execute a Non-Competition, Non-Solicitation, and Confidentiality Agreement, which she signed on July 26, 2012 (the "Agreement").  **Day 1 (56:21-57:23); Pl.  Ex. 2.**

21.     Signing the Agreement was a condition of Shafer's and all RNN employees' employment because RNN recruiters have access to the Company's confidential database, which contains information for 400,000 nurses, including names, phone numbers, email addresses, and specialties, and it is important to RNN that employees agree they will not take this information with them if they leave the Company.  **Day 1 (56:12-23)**

22.     If Shafer had refused to sign the Agreement, she would not have been allowed to work at RNN. **Day 1 (56:24-57:1)**

23.     In Paragraph 4(c) of the Agreement, Shafer agreed that at the end of her employment with RNN, she would immediately return all of the Company's confidential business information in her possession and that she would not retain any copies thereof, whether in hard copy or electronic form.  **Pl. Ex 2.**

24.     The Agreement defines confidential business information as:

> trade secrets and other confidential and proprietary information of the Company . . . including without limitation to information relating to . . . current, former and prospective Healthcare Personnel (including, without limitation, names, addresses, telephone numbers, email addresses, mailing lists, other personal and contact information, records of Healthcare Personnel staffing history, preferences, and requirements, licensing and credentialing information and requirements, rates, fees, benefits, and compensation information, contract terms, and prospects), methods and types of recruitment and placement services, methods of service preferred by Clients and Healthcare Personnel[.]

**Pl. Ex.  2, ¶ 4**.

25.     Shafer understood when she signed this Agreement that nurse client lists, even those she created or added to with nurses she placed through leads and referrals, are the property of RNN.  **Day 2 (78:2-16).**  She also understood that the terms "clients" and "Healthcare Personnel" meant nurses.  (***Id.*; 79:17-19*)

26.     In Paragraph 5 of the Agreement, Shafer agreed that for a period of twelve months following the later of (i) the termination of her employment or (ii) any breach of the Agreement (the "Restricted Period"), she would not "be employed by . . . any entity that is engaged in or competes with the type(s) of staffing that [she] was engaged in at any time during [her] last three (3) years of employment with the Company." **Pl. Ex. 2, ¶ 5.**

27.     The type of staffing Shafer was engaged in during the last three years of her employment with RNN was travel nurse staffing.  **Day 2 (127:3-10)**

28.     In Paragraph 6 of the Agreement, Shafer agreed that during the twelve (12) month Restricted Period, she would not (i) "directly or indirectly solicit, recruit, offer or otherwise provide services, or attempt to solicit, recruit, offer or otherwise provide services, that are the same as or similar to [RNN's] Business to any current, former or prospective Healthcare Personnel or Clients of the Company with whom [she] worked or serviced . . . during [her] last three (3) years of

employment with the Company" and (ii) "induce, encourage, solicit or cause, or attempt to induce, encourage, solicit or cause Healthcare Personnel or Clients to cease doing business with, or otherwise change or diminish the Healthcare Personnel or Clients' business with the Company. **Day 2 (129:3-11), Pl. Ex. 2, ¶ 6**.

29.     During her 17 years of employment with RNN, Shafer gained knowledge of trade secrets and other confidential and proprietary information of RNN, including, information relating to current, former and prospective nurse and facility clients; nurse preferences (e.g., locations/states, hours, types of work, rates and fees) learned over time and developed through relationships that enabled her to make placements faster than RNN's competitors; assignment information so she was aware of when certain contracts would end and when certain nurses would be looking and available for another opportunity; strategies for negotiating compensation packages; and financial information relating to the business of RNN. **Day 1 (42:10-16); Pl. Exhs. 12, 13**.

30.     Shafer was a successful recruiter at RNN.  In 2022, Shafer was among RNN's top recruiters generating $6 Million in gross margin and earning $615,000 in total compensation. **Day 1 (44:2-4).**

31.     Shafer stats that she is an "expert" in nurse recruiting, a skill she learned through "sweat, tears, many hours, working Saturdays, googling information, making forums with other recruiters" and 17 years of work at RNN.  **Day 2 (94:24; 124:9-23).**

32.     During her employment, Shafer received the same training as all other RNN recruiters (weekly or monthly), and she was promoted from to the position of Senior Recruiter. **Day 1 (36:20; 42:2-4; 44:5-7)**.

33.     During her employment, Shafer developed strong relationships with the RNN's nurse clients.  **Day 1 (40: 13-16)**.

34.     While working at RNN, Shafer generated nurse clients from two sources: (i) leads provided by RNN to Shafer that RNN purchased from third parties, and (ii) referrals for which RNN paid referral bonuses.  **Day 2 (132: 16-25)**.

35.     As for Shafer's referral base, existing RNN nurse clients would recommend colleagues to Shafer who were seeking a temporary assignment.  **Day 2 (132:23-25)**.  RNN would pay the referring nurse a referral bonus of $1200 per referral.  *Id*.; **Declaration of Eleonor Ruffy, ¶ 4 ("Ruffy Dec.")** [D.E. 66].

36.     Between 2018 and 2023, **Shafer received 238 referrals at RNN for which RNN paid $250,550 in referral fees**.  **Ruffy Dec. ¶ 5.**

37.     Throughout Shafer's employment with RNN, she was placed on several performance improvement plans ("PIPs") for violating company policies and processes on a regular basis, insubordinate conduct towards her managers, inappropriate nonprofessional communications with assistants and business partners, and bullying of employees, which RNN testified created a toxic work environment.  **Day 1 (44:9-23; 124:15-23).**

38.     On February 17, 2023, Shafer was issued a final PIP based on her behavior and ongoing failure to follow Company processes and procedures.  **Day 1 (44:9-23); Pl. Ex**. **4**.

39.     On March 30, 2023, RNN terminated Shafer's employment. **Day 1 (45:5-6)**.

40.     On the day of her termination, Shafer was emailed a separation notice enclosing a copy of her Agreement, reminding her of her post-employment non-compete, non-solicit and non-disclosure covenants, as well as reminding her of her obligation to return all company documents and property in her possession or control to RNN.  **Day 1 (61:6-24); Pl. Ex. 5.**

41.     Shafer did not return any documents to RNN after she received this letter on March 30, 2023.  **Day 1 (61:25-62:2); Day 2 (83:4-7).**

**<u>Shafer's Theft of RNN's Information</u>**

42.     Shortly after her termination, RNN discovered that Shafer had emailed its confidential, trade secret information to her personal email address in the days leading up to her termination. **Day 1 (62:3-8)**

43.     At 2:19 P.M. on March 9, 2023, Shafer's leader, Chrissy Evans, sent Shafer an email informing Shafer that she was not meeting the performance expectations of the PIP and that "further unsatisfactory behavior and ongoing deficiencies in [her] behavior or performance will result in further disciplinary action, up to and including separation."  **Day 1 (64:4-7), Pl. Ex. 5.**

44.     Shafer testified that she knew "things were coming to an end" and that her job was in jeopardy.  **Day 2 (104:4-10).**  She spent the remainder of that afternoon forwarding RNN's client lists and confidential, trade secret information from her RNN email address to her personal email address and searching for nurse recruiter jobs.  **Day 1 (85:4-10).**

45.     At 2:58 P.M., approximately 40 minutes after she received the email from Chrissy Evans, Shafer emailed an Excel Spreadsheet titled Team Shafer W&A Week 10 2023.xlsx ("W&A Week 10 Spreadsheet") from her RNN email address to her personal Gmail address.  **Day 1 (82:3-8), Pl. Ex. 13**.

46.     The W&A Week 10 Spreadsheet is highly confidential internal report containing a list of all of RNN's nurses who were on assignment or who were contracted to go on assignment in the future.  **Day 1 (64:4- 67:23), Pl. 13**. The W&A Week 10 Spreadsheet includes the nurses' first and last names, the hospital facility client where each nurse was assigned to work, the state in which each facility client is located, the start and end date of each assignment, the recruiter who

placed each nurse, the bill rate for each nurse, RNN's gross margin/profit for each nurse at each assignment, each nurse's area of specialty, preferred shift, compensation, housing requirements and more.  **Day 1 (64:4- 67:23), Pl. 13**.

47.    The W&A Week 10 Spreadsheet contains this information for the 2,541 nurses RNN had on assignment or had signed contracts and were waiting to begin an assignment as of March 12, 2023, including 112 nurses who Shafer had placed.  **Day 1 (68:19-23)**.

48.    W&A Spreadsheets, such as the W&A Week 10 Spreadsheet, are "highly confidential" because the lists consist of RNN's nurses who are actually contracted to be on assignment with RNN, as opposed to a prospect list, and there are about 4 million nurses throughout the country with only about 50,000 of them do travel nursing.  Because of the difficulty, time and resources it takes to identify travel nurses, the W&A Spreadsheets are "very precious" to RNN and would be beneficial to a competitor.  **Day 1 (64:15-67:23).**  The W&A spreadsheets are RNN's "bread and butter" and would be extremely detrimental to RNN if it ended up on the hands of a competitor.  **Day 1 (67:24-68:17; 104:2-10)**.

49.    Shafer admitted during the hearing that the contact information for the nurses appearing on the W&A Spreadsheets she took constitute confidential information.  **Day 2 (83:8-14).**  Shafer also testified that it is "not possible" to recreate the W&A Spreadsheets from publicly available sources.  **Day 2 (97:10-12).**

50.    Approximately 90 minutes after Shafer emailed to herself the W&A Week 10 Spreadsheet, she emailed herself a job posting link for nurse recruiter jobs at Aya Healthcare, a competitor of RNN and "the biggest nurse recruiting agency there is." **Day 1 (82:14-83:2, 14-25), Day 2 (98:21-99:6; 99:24-100:14); Pl. Ex. 15.**  Notwithstanding her non-compete agreement, Shafer applied for a position as a nurse recruiter at Aya Healthcare.  ***Id.***

51.     Later that same day, at 7:22 p.m., Shafer updated her resume on RNN's systems and emailed it from her RNN email address to her personal Gmail address. **Day 1 (84:5-85:3) Pl. Ex. 20)**.  The resume includes language  unique to nurse staffing, such as "over 100 TOA March 2023" indicating she was looking for work at a travel nurse staffing company. *Id.* **Day 2 (101:1-6).**

52.     Shafer testified she was looking for new jobs as a nurse recruiter despite signing a one-year non-compete agreement with RNN because "noncompetes don't mean anything in Florida." **Day 2 (101:7-11; 102:24-2).**

53.     The following morning, March 10, 2023, Shafer continued to email confidential and trade secret information from RNN's secure system to her personal Gmail address.  **Day 1 (75:10-20)**.

54.     At 9:21 a.m., Shafer emailed to her personal Gmail account another large Excel Spreadsheet titled "RS W&A Week 6 20023.xls ("W&A Week 6 Spreadsheet") containing information for RNN nurses currently on assignment or contracted and waiting to begin an assignment. **Day 1 (75:14-76: 23), Pl. Ex. 12**.

55.     The W&A Week 6 Spreadsheet contains detailed information for 2,576 of RNN's nurses, including names, email addresses, specialties, preferred shifts, facility clients where they were placed, assignment start and end dates, bill rates, RNN's gross margin for each nurse, and all of the same information that appears for RNN's nurses on the W&A Week 10 Spreadsheet. **Day 1 (75:14-76: 23), Pl. Ex. 12**.

56.     Shafer further testified that she emailed the W&A Spreadsheets to her personal Gmail account because RNN would not allow her to connect a printer to her work computer to protect the "safety of their information." **Day 2 (84:4-23).**

57.     Shafer uses the W&A Spreadsheets to see which nurses are ending their assignments so she knows to find them a new assignment and remembers to "touch base with them, keep in close contact." **Day 2 (146:4-10; 147:20-148:2; 162:7-19; 193:)** She further testified that she did not need the W&A Spreadsheets at AHS because she had memorized the information in them, but she could not recall Amanda Fobar's first name, even though Fobar was a nurse Shafer had recently placed. **Day 2 (191:22-193:19).**

58.     During RNN's investigation of what Shafer took from the Company's systems, RNN did not find a single email prior to March 9, 2023 where Shafer emailed to her personal email account W&A Spreadsheets, and Shafer did not present any evidence showing she did so. **Day 1 (76:24-77:6); Day 2 (153:6-154:4, 194:12-195:12).**

59.     Shafer introduced a 2022 commission sheet that she had emailed to herself, which does not include the same information that appears on the W&A Spreadsheets, as this document contains information for only a handful of nurses placed by Shafer (as opposed to 2400+ nurses) and it does not contain any nurse contact information, email addresses, information about the nurses' specialties, preferred shifts, housing preferences, or how much money is being billed to healthcare facilities by RNN all over the country. **Day 2 (66:3-67:22; 151:11-153:19).**

60.     In addition to retaining the information contained in the W&A Spreadsheets, Shafer retained RNN nurse contact information in her personal cellphone, which she had not deleted and still retained at the time of the November 7, 2023 hearing in this case. **Day 2 (79:23-80:6; 81:12-14; 108:25-109:8; 114:12-14; 119:10-17; 200:13-16)**

61.     While Shafer testified that her "cell phone is all over Facebook, LinkedIn, everywhere," implying that RNN nurses reached out to her, nowhere on her public LinkedIn page admitted into evidence does her cell phone number appear. **Day 2 (76:3-5), Pl. Ex. 34.**

**Shafer's Employment with AHS**

62.     In May 2023, weeks after her termination from RNN, Shafer accepted a job as a nurse recruiter at AHS performing the same nurse staffing job duties that she performed during her employment with RNN. **Day 2 (75:7-20, 124:24-125:3; 126:1-4).**

63.     Like RNN, AHS is a healthcare staffing company that places travel nurses with healthcare facilities throughout the United States, and it is a direct competitor of RNN. **Day 1 (36:7-9); Day 2 (124:24-3).**

64.     Shafer testified that during her employment with AHS, she uploaded contact information for nurses with whom she worked at RNN into AHS's system. **Day 2 (111: 10-14; 114:12-16)**.

65.     Shortly after Shafer's employment with AHS began, several nurses Shafer had placed notified RNN that Shafer was reaching out to them as a nurse recruiter at AHS. **Day 1 (45:9-16)**. Shafer contacted nurses whose information appeared in the W&A Spreadsheets to see if they would be interested in working with her at AHS. **Day 2 (115:7-116:9; 117:21-23).**

66.     Shafer also testified she offered employment agreements to nurses she worked with at RNN, such as Amanda Fobar, whose name appears on the W&A Week 10 Spreadsheet, and possibly Natalie Turner. **Day 2 (114:22-24; 115:14-117:8, 21-23), Pl. Ex. 10.**

67.     Shafer admits she repeatedly sent text messages to every nurse in her cell phone stating "Hi are you still travel nursing?  I would love to work with you!  I have 17 years of experience," and "after 17 years I switched companies.  Are you still travel nursing?" providing her name, phone number and AHS email address. **Day 2 (118:6-119:13), Pl. Ex. 23.**  Notably, Shafer testified she did not provide her personal cell phone number on these text messages. *Id.*

68.     Shafer repeatedly sent these text messages month after month, even if the nurse did

not respond, because she knew that travel nurse assignments only last 12 weeks at a time "and you have to keep calling, texting, emailing and that's how you eventually get to them."  **Day 2 (120:6-11), Pl. Ex. 23.**

69.     Among the persons Shafer texted while working for AHS was RNN employee, Emily Sporl, who is not a travel nurse.  **Day 2 (119:2-8)**.   Shafer, however, believed Sporl to be a travel nurse, as her contact information had been entered into RNN's database as though she was a travel nurse to test the software and view it from the travel nurse's experience.  **Day 1 (89:24-90:6)**.

70.     Between June 23, 2023 through August 17, 2023, Shafer texted Sporl three times, attempting to solicit her to work with Shafer at AHS, despite no response from  Sporl. **Day 2 (118:6-25), Pl. Ex. 23**.

71.     Shafer admitted during the hearing that she sent similar text messages to the ones she sent to Sporl to "every nurse" in her phone, which included RNN's nurses.  **Day 2 (119:13-120:2).**

72.     Shafer also testified that when she left RNN, she told the RNN nurses she had worked with that she was no longer with RNN and let them know where she was working so they could "come on board" with her at AHS.  **Day 2 (119:22-120:2; 198:1-4).**

73.     Although the Agreement prohibits Shafer from offering or otherwise providing services that are the same as RNN's to nurses with whom she worked at RNN during the twelve (12) month restricted period, Shafer admits that during her employment with AHS she attempted to place nurses Amanda Fobar, Matthew Dean, Alicia Marcia Billings, and Haley Hohnhorst at AHS, all of whom she worked with at RNN during her last three years of employment and whose

names and information appear on the W&A Spreadsheets. **Day 1 (130:3-131:24); Day 2 (129:3-130:11); Pl. Ex. 9, 12 and 13.**

## PROPOSED CONCLUSIONS OF LAW

### I.   STANDARD FOR MOTION FOR PRELIMINARY INJUNCTION AND APPLICABLE LAW

"To support a preliminary injunction, a district court need not find that the evidence positively guarantees a final verdict in plaintiff's favor." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). "Rather, the court must determine whether the evidence establishes each of the four prerequisites." *Developers Sur. & Indem. Co. v. Bi-Tech Constr., Inc.*, 964 F. Supp. 2d 1304, 1308-09 (S.D. Fla. 2013). "When considering a motion for preliminary injunction, a district court may assess the relative strength and persuasiveness of the evidence presented by the parties, and is not required to resolve factual disputes in favor of the non-moving party." *Rensel v. Centra Tech, Inc.*, No. 17-24500-CIV, 2018 U.S. Dist. LEXIS 106642, at *10 (S.D. Fla. June 25, 2018) (citing *Imaging Bus. Machs., LLC. v. BancTec, Inc.*, 459 F.3d 1186, 1192 (11th Cir. 2006)).

To obtain a preliminary injunction under Florida and Utah law, RNN must show: (1) a substantial likelihood of success on the merits; (2) an irreparable injury in the absence of the requested injunction; (3) a threatened injury that exceeds any injury to the non-moving party caused by the injunction; and (4) that an injunction would not disserve the public interest. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005); *see Textron Fin. Corp. v. Unique Marine, Inc.*, No. 08-10082-CIV, 2008 U.S. Dist. LEXIS 90245, at *12–13 (S.D. Fla. Oct. 22, 2008); *Prop. Mgmt. Bus. Sols. v. Averitte*, No. 2:18-CV-552, 2018 U.S. Dist. LEXIS 154644, *8 (D. Utah Sept. 10, 2018).

CASE NO.: 23-61703-CIV-SINGHAL/VALLE

As an initial matter, the parties acknowledge having executed the Agreement that includes a choice of law provision stating that it is governed by Utah law.  Specifically, the Agreement states:

> Employee and the Company agree that ***the validity, interpretation, construction, effect, and enforcement of <u>this Agreement</u> shall be governed by the laws of the State of Utah***, without regard to any conflict-of-law rules or principles that would require the application of the substantive law of a State other than Utah.

**Plt's Ex. 2**.  (emphasis added).  The parties do not dispute that Utah law applies to RNN's breach of contract claim.  Therefore, the Court will apply Utah law with respect to Count I.

The parties, however, dispute whether the choice of law provision applies to RNN's statutory and common law claims (Counts II through VIII).  "A choice of law provision that relates only to the agreement will not encompass related tort claims."  *See Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009); *see also Future Metals LLC v. Ruggiero*, Case No. 21-CIV-60114 -RUIZ/STRAUSS, 2021 U.S. Dist. LEXIS 72223 * 42 (S.D. Fla. April 13, 2021) (applying Florida law to trade secret violations where the language of choice of law provision did "not explicitly extend to 'all disputes arising out of or relating to the Confidentiality Agreement'").  The choice of law provision at issue here is expressly limited to disputes arising out of the Agreement.  The parties did not contract to apply Utah law to every dispute arising out of Shafer's employment relationship.  Accordingly, the Court concludes that Utah law applies to the breach of contract claim and that Plaintiff properly brings a trade secret misappropriation claim under Florida's Uniform Trade Secrets Act, Fla. Stat. § 688.002.  Further, Plaintiff's claims of conversion (Count IV), breach of fiduciary duty (Count V) civil conspiracy (Count VI), and tortious interference with business and contractual relationships (Count VII) are governed by Florida law.  Nevertheless, even as to RNN's breach of contract claim, the Court finds Florida law to be

16

CASE NO.: 23-61703-CIV-SINGHAL/VALLE

persuasive.  *See Bad Ass Coffee Co. of Hawaii, Inc. v. JG Enterprises, LLC*, 636 F.Supp.2d 1237, 1245-46 (D. Utah 2009) ("the question of whether Utah or Florida law controls is not important . . .  the  difference between the two is not substantial.").

## II.      RNN Has Established a Substantial Likelihood of Success on the Merits

"A substantial likelihood of success on the merits is shown if good reasons for anticipating that result are demonstrated."  *Southern Wine and Spirits of America, Inc. v. Simpkins*, No. 10-21136-Civ-COOKE, 2011 U.S. Dist. LEXIS 5762, at *6 (S.D. Fla. Jan. 14, 2011); *see Atlanta Sch. Of Kayaking, Inc. v. Douglasville-Douglas Cnty. Water and Sewer Auth.*, 695 F.2d 536, 539 (11th Cir. 1983) ("The Court need not conclude that plaintiffs have carried their burden of proof on any single claim or on all claims, only that the proof supports a substantial likelihood of success on at least one claim or theory which in turn would support a preliminary injunction.")).

### A.      Breach of Employment Agreement

RNN has shown a substantial likelihood of success on the merits on its breach of contract claims against Shafer. Under Utah law, in order to show a substantial likelihood of success on the merits of its breach of contract claim (Count I), RNN must demonstrate that "(1) the noncompete provisions are valid and enforceable, and (2) [Shafer] is in violation of the contract provisions at issue."  *See, e.g., Prop. Mgmt. Bus. Sols. v. Averitte*, No. 2:18-CV-552, 2018 U.S. Dist. LEXIS 154644, *9 (D. Utah Sept. 10, 2018).

As an initial matter, the restrictive covenants in the Agreement are valid and enforceable. To establish that a post-employment restrictive covenant is enforceable, a movant must establish:

> that (1) the covenant not to compete must be supported by consideration; (2) no  bad faith may be shown in the negotiation of the contract; (3) the covenant must be  necessary to protect the goodwill of the business; and (4) the covenant must be  reasonable in its restrictions in terms of time and geographic area.

CASE NO.: 23-61703-CIV-SINGHAL/VALLE

*See System Concepts v. Dixon*, 669 P.2d 421, 425-26 (Utah 1983).

The evidence shows that the Agreement was supported by consideration. *See Dixon*, 669 P.2d at 426 ("offer of continued employment to be adequate consideration for the defendant's submission to the terms of the covenant"). There was neither evidence nor allegation of any bad faith in the negotiation of the Agreement. To the contrary, testimony given by Ms. Ruffy at the hearing demonstrates that the Agreement was RNN's standard restrictive covenant agreement given to all employees with access to RNN's confidential information and trade secrets.

Next, the Agreement is necessary to protect RNN's goodwill and trade secrets. The W&A Spreadsheets (containing nurse preferences, contact information, and other confidential and non-public information) at issue can be considered confidential and trade secret. Thus, RNN has a legitimate interest to protect its confidential, trade secret information RNN needed to provide Shafer in order for Shafer to succeed at RNN. *See Sys. West Performance, LLC v. Farland*, Case No. 2:14-cv-00276-DN-BCW, 2015 U.S. Dist. LEXIS 109698 * 13 (D. Utah Aug. 18, 2015) ("A covenant not to compete is valid when it protects goodwill as well as trade secrets."). RNN also has shown a legitimate business interest in its relationships and goodwill with its nurse clients, which is a legitimate interest under Utah law. *See id.* at 13 ("These allegations are sufficient to show that Farland worked closely with SWP's clients and developed a relationship. As such, it is plausible that he was responsible for SWP's goodwill when working for SWP's clients. Therefore, this factor weighs in favor of reasonableness and enforceability."). While Shafer presented evidence that RNN does not have exclusive relationships with the nurses on the spreadsheets and lists at issue, Ruffy testified that RNN's employees devote a significant amount of time to developing those relationships in hopes of securing future business for RNN. *Dixon,* 669 P.2d at 421 ("As with many sales positions, regardless of the industry, forming relationships with

prospective and existing customers is invaluable and often vital for success."). Thus, RNN has a legitimate business interest in preventing its employees from leveraging the relationships they built at RNN's expense to benefit another company. *See id.*; *see also Kasco Servs. Corp. v Benson,* 831 P.2d 86, 88 n. 2 (Utah 1992) ("Benson was trained by Kasco to service and repair grinders, saws, slicers, and tenderizers manufactured and sold only by Kasco. He was entrusted with Kasco's preexisting customers and given confidential customer and pricing lists. . . .  all the goodwill of the employer was associated with and created by the employee."); *N. Am. Products Corp. v. Moore*, 196 F. Supp. 2d 1217, 1228 (M.D. Fla. 2002) ("Where an employee, as here, gains substantial knowledge of his former employer's customers . . . and their needs and specifications it follows that the employer has a legitimate business interest under the statute.").

Additionally, the restrictions in the covenants are reasonable as to time and geographic scope. The non-competition provision is reasonable as to time, as it is limited to one year following the termination of employment. *See* Utah. Code 34-51-102) (stating that restrictions against a former employee are void if they are over one year in duration); *see Farland*, 2015 U.S. Dist. LEXIS 109698 at *11 ("A one-year time restriction seems reasonable under the circumstances plead. . .").

The non-competition provision also is reasonable in area – within the United States - because RNN, like AHS and other nurse staffing agencies, has relationships with nurse providers and facility clients throughout the nation and places nurse providers all over the country. *See, e.g, Dixon,* 669 P.2d 421 at 427 (non-compete covenant with unlimited geographic restriction was reasonable and enforceable where employer cable company had customers nationwide); *Farland*, 2015 U.S. Dist. LEXIS 109698 at  *11 (enforcing non-compete provision with an unlimited geographic range where employee was only prohibited from working in the "target market of his

former employer"); *Ivy Staffing Sols., LLC,* No. 21-CV-62221-MORENO, 2022 U.S. Dist. LEXIS 66558, at 40. *See also Victaulic Co. v. Tieman*, 499 F.3d 227, 238 (3d Cir. 2007) (finding that a broad geographic area was reasonable where the defendant had relationships with customers across North America). While Utah Courts have acknowledged caution against enforcing nationwide non-competition restrictions, that caution is alleviated where the restriction is narrowly tailored to a specific activity. *See, e.g, Dixon,* 669 P.2d 421; *Farland*, 2015 U.S. Dist. LEXIS 109698 at *11. The non-competition provision here is reasonable as to the restrictive activity because it is specifically limited to employment by a "competitive business" of RNN, which is defined as "any person or entity that is engaged in or competes with the type(s) of staffing that Employee was engaged in at any time during Employee's last three (3) years of employment with [RNN]." Shafer testified that the "types of staffing" she engaged in was travel nurse staffing. The activity restriction is sufficiently narrow to warrant a nationwide geographic area. See *Dixon,* 669 P.2d 421

Although Shafer testified during the hearing that nurse staffing requires expertise and significant knowledge, in her opposition brief she argues that the restrictive covenant is not enforceable because nurse staffing is allegedly a "common calling," citing to *Scenic Aviation, Inc. v. Blick*, 2:02-CV-01201 PGC, 2003 U.S. Dist. LEXIS 28009 *8 (D. Utah Aug. 4, 2003). Even if Shafer had testified consistently with this position, Shafer's reliance on *Blick* is misplaced. In *Scenic Aviation*, an air ambulatory company sought to enforce a restrictive covenant against a flight nurse, a flight paramedic, and a pilot. *Id.* at 2. The Court in *Scenic Aviation* found that there was no legitimate interest in enforcing the restrictive covenant in that case because the pilot, nurse, and paramedic did not have any specialized training specific to the business of the air ambulatory business. *Id*. at 18 ("These two defendants were emergency medical staffers, and Scenic has not alleged they had any unique responsibilities other than taking care of individuals that had the

misfortune of being injured."). Further, the Court found that *Scenic Aviation* did not demonstrate any goodwill in connection to the employment of the defendants because the goodwill was due entirely to *Scenic Aviation's* certification and the need for hospitals to choose a certified air ambulatory service. Indeed, the Court expressly found that any goodwill was attributable to the "CAMTS certification, rather than to any personal relationship that [Defendants] (among others) may have established with these hospitals." *Id.* at 18.

The facts here, however, are quite different. Shafer had longstanding relationships with RNN nurse providers. A significant portion of Shafer's job was dedicated to maintaining these relationships so that nurse providers would return to RNN for new placements when their assignments were set to expire. Shafer was provided with RNN's confidential, trade secret information, including information purchased through third-parties, to facilitate nurse relationships so that the nurses would return to RNN for repeat placements. As was the case in Kasco, "all the goodwill of [RNN] was associated and created by [Shafer]." *Kasco*, 831 P.2d at 88, n 2. The Court therefore concludes that this matter is distinguishable from *Scenic Aviation* and that Shafer's employment with AHS violates the "non-competition" provision in her agreement under this set of facts. Further, Shafer's argument that nurse recruiting is not a common calling is refuted by her own testimony. Indeed, Shafer considers herself an expert in nurse recruiter, through over decade of learning and experience. Shafer states that her skills can only be applied to the nurse recruiting filed. Even if true, such testimony goes against Shafer's contention that nurse recruiting is a common calling.

Even if the Court were to find that the Agreement's non-competition provision is overbroad as written, the Agreement provides the Court the ability to reform the non-competition provision:

> **Reformation; Severability**. The Company intends to restrict
> Employee under this Agreement only to the extent necessary for the

> protection of the Company's legitimate business interests. The Company and Employee agree that the scope, duration and geographic area provisions are reasonable. In the event a court of competent jurisdiction concludes that any provision of this Agreement is too restrictive, such provision(s) shall nevertheless be valid and enforceable to the fullest extent permitted by such court, and such provision(s) shall be reformed to the maximum scope, time, arid/or geographic limitations determined appropriate by such court. If any one or more of the terms, provisions, covenants or restrictions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Pl. Ex. 2 at 10(b) (emphasis added).  Further, due to the reformation and severability clause above, even if the Court were to find that the Agreement's non-competition provisions are unenforceable, such a finding would not invalidate the non-solicitation, confidentiality, and company property provisions of the Agreement.  However, for the reasons discussed herein, the Agreement is enforceable under Utah law, and reforming or severing provisions of the Agreement is not warranted.

Finally, the evidence shows that RNN has a substantial likelihood of success in proving that Shafer breached her agreement. As an initial matter, Shafer does not dispute that her employment with AHS breached her non-competition Agreement.  Shafer expressly testified that she was aware her employment with AHS violated the terms of her non-compete agreement with RNN, but that she took the position regardless because she believed non-compete agreements are unenforceable in Florida.  **Day 2 (101:7-11).**  Shafer's provision of nurse recruiting services on behalf of AHS constituted a breach of her agreement, as she was "employed . . .  by . . . an entity that is engaged in or competes with the type(s) of staffing that Employee was engaged in at any time during Employee's last three (3) years of employment with the Company."  Pl. Ex. 2 at ¶ 5.

Further, the evidence shows that RNN has demonstrated a substantial likelihood of success on its claim that Shafer breached the non-solicitation provisions of the Agreement. The non-solicitation provision provides that Shafer:

> [S]hall not, in any manner, either ***directly or indirectly*** . . . ***solicit, recruit, offer or otherwise provide services, or attempt to solicit, recruit, offer or otherwise provide services,*** that are the same as or similar to [RNN's] Business to any current, former or prospective Healthcare Personnel or Clients of the Company with whom Employee worked with or serviced, communicated with, had contact in any manner, or otherwise was aware of during Employee's last three (3) years of employment with the Company. Employee further agrees that, during the Covenant Period, Employee shall not, in any manner, either ***directly or indirectly, induce, encourage, solicit or cause, or attempt to induce, encourage, solicit or cause Healthcare Personnel or Clients to cease doing business with, or otherwise change or diminish the Healthcare Personnel or Clients' business with, the Company***.

Pl. Ex. 2 at ¶ 6.

The evidence presented at the hearing shows that Shafer solicited, attempted to solicit, offered and provided staffing services to a number of RNN nurses whose names and information appear on the W&A Spreadsheets during the twelve (12) month restricted period, including Amanda Fobar, Matthew Dean, Alicia Marcia Billings, and Haley Hohnhorst. Day 1 (130:3-131:24); Day 2 (129:3-130:11); Pl. Ex. 9, 12 and 13. Shafer even admitted to offering AHS employment agreements to RNN nurses such as Amanda Fobar and possibly Natalie Turner, during the restricted period. Day 2 (114:22-24; 115:14-117:8, 21-23), Pl. Ex. 10. Shafer further testified, and the evidence presented shows, that Shafer repeatedly sent text messages to every nurse in her cell phone, including RNN nurses, stating "Hi are you still travel nursing? I would love to work with you! I have 17 years of experience," and "after 17 years I switched companies. Are you still travel nursing?" providing her name, phone number and AHS email address, soliciting them to work with her at AHS. Day 2 (118:6-119:13), Pl. Ex. 23. Shafer repeatedly sent

these text messages month after month, even if the nurse did not respond, because she knew that travel nurse assignments only last 12 weeks at a time "and you have to keep calling, texting, emailing and that's how you eventually get to them."  Day 2 (120:6-11), Pl. Ex. 23.  The evidence therefore shows Shafer violated her non-solicitation agreement with RNN.

Finally, Shafer has breached her confidentiality agreement with RNN.  As discussed below, Shafer emailed to her personal email address confidential W&A Spreadsheets containing RNN's trade secrets, in breach of her Agreement and the Company's policies.  **Day 2 (78:17-19)** ("employees must not remove or use outside of the scope of your employment with CHG, the following materials and information, including electronic copies of same . . . Names, addresses, and phone numbers of CHG employees, clients, healthcare professionals and potential customers." The Agreement required Shafer to return to RNN, and to not retain any copies of, RNN's Confidential Business Information, defining Confidential Business Information as "information relating to . . . current, former, or prospective Healthcare Personnel" (i.e. nurse contact information).   Plt. Ex. 2 at ¶ 4(c).  Shafer, moreover, admitted that she retained nurse contact information in her personal cell phone after her employment with RNN ended, which was still in her cell phone as of the date of the November 7, 2023 hearing.  Shafer's retention of RNN's nurses' contact information following her separation from employment is a breach of her Agreement.

The fact that Shafer received a portion of her business from nurse referrals is irrelevant, as information related to nurses who were referred to Shafer at RNN is the property of RNN.  There is no dispute that RNN, and not Shafer, paid the referral sources a $1200 referral bonus for each new nurse referred to Shafer during the last three years of Shafer's employment (and bonuses of $500-$1000 prior to 2020).  Shafer testified at the hearing that she was aware RNN paid a fee to her referral sources.  Thus, even if a nurse came to RNN through Shafer as a referral, RNN paid

for that referral and the referred nurse's contact information, which was then uploaded into RNN's database, is considered company property of RNN. Further, to the extent the referred nurse was placed on assignment through RNN, that nurse would become a "current, former, or prospective Healthcare Personnel . . . with whom [Shafer] worked with or serviced" under the Agreement. Thus, regardless of whether the nurse came through a lead provided by RNN or through a referral sent to Shafer, the result is the same. Shafer's retention of contact information for nurses referred to her during her employment with RNN constitutes a breach of her Agreement.

### B.   <u>Trade Secret Claims</u>

RNN has shown a substantial likelihood of success on its federal and state trade secret claims against Shafer. The DTSA creates a private cause of action in favor of the "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). To obtain injunctive relief under the DTSA, a plaintiff must prove either "actual" or "threatened" misappropriation. *See* 18 U.S.C. § 1836(3)(A)(i). The FTSA similarly provides a cause of action for the misappropriation of trade secrets. *See Yellowfin Yachts, Inc. v. Barker Boatworks, LLC,* 898 F.3d 1279, 1297 (11th Cir. 2018) (citing Fla. Stat. §§ 688.001-009). To obtain injunctive relief under the FTSA, a plaintiff must also prove "actual" or "threatened" misappropriation. *See* Fla. Stat. § 688.003.

### i.   **Qualification as Trade Secret**

RNN has demonstrated a substantial likelihood that the information at issue is "trade secret" under both the DTSA and FTSA. The trade secrets at issue are the nurse client lists and information contained in the W&A Spreadsheets that Shafer sent from RNN's system through her RNN email account to her personal email account containing detailed information for more than 2,500 nurses. Client lists such as those in the W&A Spreadsheets are typically classified as

confidential and trade secret. *See Hayes Healthcare Services, LLC v. Meacham*, 19-60113-CIV-COHN/SELTZER, 2019 U.S. Dist. LEXIS 113890, 2019 WL 2637053, at *1 (S.D. Fla. Feb. 1, 2019) (stating that a healthcare staffing company's client and provider list is protectable as a trade secret); *Corp. Ins. Advisors v. Addeo*, No. 21-61769-CIV-GAYLES/STRAUSS, 2021 U.S. Dist. LEXIS 235074, at *17-18 (S.D. Fla. Dec. 8, 2021) (citing *AutoNation, Inc. v. Mulleavey*, 19-60833-CIV, 2019 U.S. Dist. LEXIS 170466, 2019 WL 4693575, at *3 (S.D. Fla. Aug. 22, 2019) (stating that customer lists, especially those with specific details, are considered trade secrets)); *Pinch A Penny, Inc. v. SR & JG, Inc.*, 9:15-CV-80067, 2017 U.S. Dist. LEXIS 153178, 2017 WL 5763118, at *9 (S.D. Fla. Sept. 19, 2017) (stating that a customer list with names, addresses, phone numbers, pool sizes, number of store visits, and purchase history was trade secret).

One spreadsheet that Shafer obtained from RNN – "Week 10 W&A" - contains the names of over 2,400 nurses, their email addresses, locations of assignment, specialties, bill rates charged to specific client facilities throughout the United States, RNN's gross margins/profit for each of the 2,400+ nurses placed, nurses' housing preferences, shift preferences, states where licensed, and current assignment information, including when the assignment is set to expire. The other spreadsheet – "Week 6 Working and Awaiting" - contains this same information for over 2,500 nurses.  While there is some duplication of information on the Week 10 W&A and the Week 6 W&A spreadsheets, the spreadsheets collectedly contain pertinent, confidential information for over 2,500 nurses, all distilled in an easily searchable Excel spreadsheet that would obviously be useful to any competitor looking to place travel nurses.  Ruffy testified that the information contained on the W&A spreadsheets, and especially the end date of each nurse's current assignment, is critical business information in that it allows RNN's recruiters to ascertain when a

nurse will be looking for a new assignment so that RNN can begin looking to match a nurse with a new assignment or to seek an extension on the current assignment.  Shafer testified that this is precisely the reason she used the W&A Spreadsheets.  Ruffy testified that the information contained on the W&A spreadsheets is not available publicly and that it would take 25 years of business in the industry to create a document with the same (or equivalent) information contained therein.  Shafer agreed, testifying that it is "not possible" to recreate these W&A Spreadsheets from publicly available sources, which is the "bread and butter" of RNN's business.

Shafer's argument that some of this information in the client lists may be publicly available does not change the analysis, as it may not be accurate, and the information is not compiled in the manner that RNN and its recruiters compile it.  *See All Star Recruiting Locums, LLC v. Ivy Staffing Sols., LLC*, No. 21-CV-62221-MORENO/STRAUSS, 2022 U.S. Dist. LEXIS 66558, at *32 (S.D. Fla. Apr. 8, 2022).  In *All Star Recruiting*, the defendant former recruiters of All Star - another temporary healthcare staffing company - also argued the information in the provider lists they emailed to their personal email addresses from All Star's system were not trade secrets because the doctors' names, numbers and addresses were available on the internet. The Court rejected this argument, stating "it may not be accurate and the information is not compiled in the manner that All Star's database compiles it." Similarly, in the instant case, Shafer testified it is "not possible" to recreate the W&A Spreadsheets (Day 2, 97:10-12), and she admitted that no one could find these spreadsheets with information organized in these distilled searchable formats on the internet or in the public realm.  (Day 2, 96:21-23).

Notwithstanding, it is well settled that even if all of the information in the spreadsheets Shafer retained were publicly available somewhere, the fact that the information was organized, distilled and compiled into unified spreadsheets with information updated by RNN, weighs in

CASE NO.: 23-61703-CIV-SINGHAL/VALLE

favor of protection. *See Ivy Staffing Sols., LLC*, No. 21-CV-62221-MORE, 2022 U.S. Dist. LEXIS 66558, at \*32 (finding unified client database updated by employees of staffing company to be trade secret); *see also Sexual MD Sols., LLC v. Wolff*, 20-20824-CIV, 2020 U.S. Dist. LEXIS 79581, 2020 WL 2197868, at \*14 (S.D. Fla. May 6, 2020); *Mulleavey*, 19-60833-CIV, 2019 U.S. Dist. LEXIS 170466, 2019 WL 4693575, at \*3; *Unistar Corp. v. Child*, 415 So. 2d 733, 734 (Fla. 3rd DCA 1982) (opining that a "distillation" or compilation of publicly available information was a trade secret).

RNN has shown that it took reasonable measures and efforts to maintain the secrecy of the information contained within its property and database.   The evidence shows that RNN has implemented security software systems, which have a multifactor authentication requiring individuals to use multiple forms of identification to prove the person logging into RNN's systems is an authorized user *before* they enter their username and password.  RNN also has a program that enables recruiters to communicate with nurse clients through a text messaging system that flows through the protected Bullhorn database so that the text messages are saved in the database, recruiters' personal cellphone information is not disclosed or exchanged, and nurse client information is saved in RNN's system – even when recruiters use their personal cell phones to communicate with the nurse clients.  RNN requires its employees to sign confidentiality, non-compete and non-solicit agreements before giving them access to confidential and trade secret information, and it employs an IT department with a privacy and security division, which monitors employee access to data and the flow of information inside and outside the organization.  The Company also uses a variety of data theft software programs to identify data breaches and scan the system for large data deletions and records being transferred out of the system security systems, as well as cameras, badges for office access, locked file cabinets and limited access throughout the

database.  It is clear that RNN takes significant steps to protect the secrecy of its confidential information and trade secrets.

Shafer's argues that RNN disclosed its trade secrets to her after her employment was terminated is unavailing.  While RNN did send Shafer a Gross Margin Spreadsheet in .pdf form in April 2023 to reconcile a dispute as to Shafer's commissions paid, the Court finds that the Gross Margin Spreadsheet was materially different than the W&A Spreadsheets at issue. That document does not contain information pertaining to more than 2,500 nurses like the W&A Spreadsheets, nor does it contain contact information, email addresses, specialties, housing preferences, shift preferences, or certain other information on the W&A Spreadsheets which would be advantageous to a competitor.  The Court finds that RNN has demonstrated the existence of trade secrets.

### ii.      Misappropriation

RNN has demonstrated a substantial likelihood of success on the merits of its misappropriation claims against Shafer.  Shafer sent the W&A Spreadsheets belonging to RNN from her RNN email account to her personal Gmail, without permission from RNN and in violation of its Company polices.  Shafer's argument that she was employed by RNN at the time and used the W&A Spreadsheets for work is misplaced.  *See All Star Recruiting Locums,* Case No 21-62221-MORENO/STRAUSS *(*finding substantial likelihood of success on the merits of misappropriation of trade secrets claim against former recruiters who sent provider and client lists to their personal email accounts during their employment, even in the absence of showing the lists were sent to a third party) (citing *Mulleavey*, 19-60833-CIV, 2019 U.S. Dist. LEXIS 170466, 2019 WL 4693575, at *4 (finding a substantial likelihood of success on a misappropriation claim where the defendant forwarded the plaintiff's customer information to his personal email)); *see also Hurry Family Revocable Tr. v. Frankel*, 8:18-CV-2869-T-33CPT, 2019 U.S. Dist. LEXIS 111308, 2019

WL 2868945, at *3 (M.D. Fla. July 3, 2019) (finding that forwarding emails from a work account to a personal account may constitute misappropriation under the DTSA).

In particular, the timing of Shafer's emails—the first one being sent 40 minutes after RNN notified Shafer of her failure to meet the expectations of her PIP and that her job was in jeopardy— provides further evidence of misappropriation. *See Addeo*, No. 21-61769-CIV-GAYLES/STRAUSS, 2021 U.S. Dist. LEXIS 235074, at *34 (finding the timing and content of Defendant's requests for former employer's confidential information provided strong evidence of her intent to utilize the confidential information upon her employment with her new employers); s*ee also Autonation, Inc. v. Peters*, 16-60010-CIV-COHN, 2016 U.S. Dist. LEXIS 57373, 2016 WL 1722365, at *4 (S.D. Fla. Apr. 29, 2016); *see also Calvo*, 16-23300-CIV, 2017 WL 8780944, at *7 (stating that the defendant's deceitful conduct supported a claim that he used the trade secrets). RNN also provided Shafer a with separation notice following her termination of employment reminding her of her obligation to return all company documents and property to RNN. Yet, Shafer failed to return the W&A Spreadsheets she took (nor anything else) to RNN.

For purposes of this analysis, it is not necessary to prove Shafer already disclosed or used the confidential or trade secret information of RNN, as a misappropriation claim does not require proof that a misappropriated trade secret was actually disclosed. *Autonation, Inc. v. Peters*, 2016 U.S. Dist LEXIS 57373, * 8 (finding a misappropriation claim does not require proof that a misappropriated trade secret was disclosed)(citing Fla. Stat. § 688.002(2)); *All Leisure Holidays Ltd. v. Novello*, No. 12-62328-CIV-ROSENBAUM, 2012 U.S. Dist. LEXIS 168774, at *15 (S.D. Fla. Nov. 27, 2012) (finding that emails showing defendants "likely have or are about to" misappropriate trade secrets was sufficient).  Further, the fact that Shafer claims that she was not aware that the W&A spreadsheets contain information pertaining to over 2,500 nurses, even if

true, is of no moment.  The fact remains that Shafer now has access to these spreadsheets which she should have returned to RNN once her employment ended, and the evidence shows she used information contained within them while performing staffing services for AHS.

### B.    Tortious Interference

RNN has shown a substantial likelihood of success on its tortious interference claim. Under Florida law, "[t]he elements of tortious interference with a business relationship are '(1) the existence of a business relationship[;] (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.'" *Duty Free Ams., Inc. v. Estee Lauder Cos*., 797 F.3d 1248, 1279 (11th Cir. 2015) (quoting *Ethan Allen, Inc. v. Georgetown Manor, Inc.,* 647 So. 2d 812, 814 (Fla. 1994)); *Marine Turbo Eng'g, Ltd. v. Turbocharger Servs. Worldwide, LLC*, No. 11-60621-CIV-MARTINEZ-MCALILEY, 2011 U.S. Dist. LEXIS 147583, at *27-29 (S.D. Fla. Dec. 22, 2011) (entering a preliminary injunction in part based on plaintiff's likelihood of success on a tortious interference with business relationships claim).

RNN has shown that Shafer tortiously interfered with its business and contractual relationships with its nurse clients.  Shafer admitted to sending solicitation text messages to every single nurse whose contact information was in her cellphone while she was at AHS and that she frequently saved RNN's nurse contact information in her cellphone.  Shafer, in fact, testified she repeatedly would send out her solicitation text messages, even when she did not receive a response, because she knew that nurse assignments end every 12-13 weeks.  Shafer also was aware of RNN's relationships with many of the nurses she either placed or offered services to at AHS because Shafer, herself, placed the nurses while she was at RNN; namely Hohnhorst, Turner, Fobar, Dean,

Billings and even Jordan Newstadt, who RNN still was attempting to place when Newstadt notified RNN that he "won't ever be working with" RNN again because of Shafer's termination.  Day 1 (92:9-93:8), Pl. Ex. 8.  The evidence clearly demonstrates Shafer interfered with RNN's relationships by soliciting and offering services to RNN's nurses, including those who were under contract and on assignment, as indicated in the W&A Spreadsheets.  Thus, RNN has demonstrated a substantial likelihood of success on its claim that Shafer tortiously interfered with is business and contractual relationships with RNN's nurses.

## III.  <u>RNN Has Demonstrated Irreparable Harm</u>

"[P]reventing irreparable harm in the future is the sine qua non of injunctive relief." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1133 (11th Cir. 2005).  Harm is often characterized as irreparable in cases involving misappropriation of trade secrets.  *All Leisure Holidays Ltd. v. Novello*, 12-62328-CIV-ROSENBAUM, 2012 U.S. Dist. LEXIS 168774, 2012 WL 5932364, at *5 (S.D. Fla. Nov. 27, 2012).  Both Florida and Utah law presume irreparable harm where a defendant violates an enforceable restrictive covenant.  Fla. Stat. § 542.335(1)(j); *Estetique Inc. USA v. Xpamed LLC*, No. 0:11-CIV-61740, 2011 U.S. Dist. LEXIS 104427, at *19 (S.D. Fla. Sep. 14, 2011) ("[W]hen the employer establishes a legitimate business interest, irreparable injury must be presumed and the burden shifts to the employee to establish the absence of such injury"); *see also InnoSys, Inc. v. Amanda Mercer*, 364 P.3d 1013, ¶33 (Utah 2015).  Courts have found that injuries stemming from misappropriation of trade secrets are not easily quantifiable and, thus, properly characterized as irreparable. Indeed, "[w]hen the failure to grant injunctive relief creates the possibility of a permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong has been satisfied."  *Shell Oil Co. v. A.Z. Services, Inc.*, 990 F. Supp. 1406, 1414 (S.D. Fla. 1997); *see also Dixon*, 669 P.2d at 427-28 (Utah 1983)

(irreparable injuries are wrongs "of a repeated and continuing character, or which occasion damages that are estimated only by conjecture, and not by any accurate standard.").

Here, RNN has shown the requisite threat of "irreparable harm" if Shafer is allowed to compete with RNN, particularly with the benefit of RNN's protected information she misappropriated. As an initial matter, Shafer has represented to the Court that she intentionally disregarded her non-competition obligations because she did not believe they were enforceable. **Day 2 (192:3-16)**. Such conduct constitutes irreparable harm. *See Bad Ass Coffee Co. of Haw., Inc. v. JH Enterprises, L.L.C*., 636 F. Supp. 2d 1237, 1249 (D.Utah. 2009) (finding "irreparable harm when their former franchisees are allowed to ignore reasonable covenants not to compete.").

Further, RNN has shown irreparable harm with respect to Shafer's misappropriation of its confidential information and trade secrets.  RNN has spent considerable time and resources developing its database of travel nurses, including specific information about nurse preferences pertaining to housing, shifts, specialties, states in which they are licensed and interested in travelling to work on a temporary basis, which information – compiled over the course of 25 years - gives RNN's recruiters a competitive advantage over recruiters at competitor companies like AHS without that information. Thus, Shafer's retention of RNN's confidential, trade secret information contained in the W&A Spreadsheets (in violation of the confidentiality provisions in her Agreement) presents a risk of irreparable harm as it allows her to compete unfairly against RNN. *See Peters*, 16-60010-CIV, 2016 U.S. Dist. LEXIS 57373, 2016 WL 1722365, at *5; s*ee also Meacham,* 19-60113-CIV-COHN/SELTZER, 2019 U.S. Dist. LEXIS 113890, 2019 WL 2637053, at *14 (finding that healthcare staffing company demonstrated that harm would be ongoing if their confidential information pertaining to healthcare providers were disclosed to competitors).

Shafer argues that that there is no imminent threat of irreparable harm because she did not need to use the W&A Spreadsheets, as she "memorized" the information contained therein.  As an initial matter, a former employee's representation that she can recall detailed information regarding hundreds (and potentially thousands) of clients is not credible.  Shafer's testimony, moreover, demonstrates that her claim she memorized the information contained in the W&A Spreadsheets is false. At the hearing, Shafer ultimately admitted that she could not memorize information pertaining to the 90 nurses she had on assignment while working at RNN.  Day 2 (192:1-4; 23-25) ("I don't have all 90 people memorized).  And, Shafer's contention that she could remember detailed information about when assignments were ending and nurse preferences, but not the names of the nurses at issue, is a clear indicator she did not have the information on the W&A Spreadsheets committed to memory.  Indeed, Shafer admitted that she did even not remember Amanda Fobar was a nurse she placed at RNN when she gave Fobar an AHS employment offer, despite having recently placed Fobar at RNN.

Finally, although Shafer has also suggested there is no threat of harm because she is now willing to return RNN's information and delete it from her possession, such an offer does not remove the threat of harm to RNN and it does not negate the need for injunctive relief. *See Meacham*, 19-60113-CIV-COHN, 2019 U.S. Dist. LEXIS 113890, 2019 WL 2637053, at *5 (stating that an offer to return trade secret information does not remove the threat of harm); *VAS Aero Servs. LLC v. Arroyo*, No. 12-CV-80484-MIDDLEBROOKS, 860 F. Supp. 2d 1349 (S.D. Fla. 2012) (offer to return information insufficient to rebut showing of irreparable harm).  Indeed, what RNN information Shafer currently has in her possession and what RNN information she has already disseminated is far from clear.  This is particularly true given that RNN has not had an opportunity to search Shafer's cell phones, computers, AHS issued computer, or AHS emails, and

that even as of the date of the hearing on November 7, 2023, Shafer retained RNN's nurse provider and client contact information in her mobile phone.  Additionally, although Shafer is no longer employed with AHS, evidence indicates she is still intending to become reemployed as a nurse recruiter during the restricted period, while she has RNN's information in her possession, and that she is in the final stages of accepting a nurse recruiter position with another RNN nurse staffing competitor, Nightingale Nurses.  Ruffy Dec.,¶ 7.  Thus the threat of irreparable harm is still imminent.

**IV.** **Balancing of Harms**

The third element of the preliminary injunction test "requires that the movant prove that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant." *Ivy Staffing Sols., LLC*, No. 21-CV-62221-MORE, 2022 U.S. Dist. LEXIS 66558, at 53 (quoting *City of S. Miami v. Desantis*, 408 F. Supp. 3d 1266, 1307 (S.D. Fla. 2019)). Thus, the Court must "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id*. (quoting *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008)).

The balance of harms weighs in favor of granting RNN an injunction and (1) enjoining Shafer from using, transferring and/or disclosing RNN's confidential and trade secret information she took, and (2) requiring her to return all RNN information she has her possession, custody, or control.  The balance of harm also weighs in favor of enjoining Shafer from working for a competitor during her restricted period and soliciting RNN's nurses during this period of time. As discussed, Shafer was employed as a Senior Recruiter for RNN and had access to RNN's confidential and trade secret information for years before her separation from employment. Her "non-competition" agreement prevents Shafer from working for a "competitive" business, which

is limited to staffing companies that compete with RNN in the nurse staffing industry. I find that the one year non-compete covenant does not prohibit Shafer from working or earning a livelihood, given the express language in her non-compete agreement permitting her to work at other staffing companies that do not perform nurse staffing during the restricted period. Shafer, in fact, testified that she was able to staff medical assistants during her employment with AHS, which was not in violation of her Agreement. Under the terms of her Agreement, Shafer can still work in the staffing industry, and she is free to recruit physicians, medical assistants, engineers, and the like. She simply cannot staff nurses.

Shafer argues that preventing her from working in nurse recruiting would prevent her from working in the only field she knows, despite testifying she recruited medical assistants while at AHS. She testified that her main gripe is her belief she will not make as much money staffing positions other than nurses during the restricted period – not that she would be unable to earn a livelihood. This concern does not tip the scales in Shafer's favor, as "[a]n employee must show more than mere 'personal hardship' for the court to find an undue hardship would exist if a particular non-competition restriction is enforced." *Godwin Pumps of America, Inc. v. Ramer*, 2011 U.S. Dist. LEXIS 73754, *19 (M.D. Fla., July 8, 2011). "[C]ourts should look to 'the likelihood of the employee finding work in his field elsewhere." *Id*.

Given the evidence presented, including the level of experience and success Shafer had in recruiting at RNN, there is a high likelihood that Shafer can find work staffing and recruiting other healthcare positions that do not involve nurse staffing for the limited restricted period – which ends October 20, 2024, the date her employment ended with AHS. Pl. 2, ¶ 5; D.E. 46-1. On the other hand, allowing Shafer to continue working for a competitor of RNN would continue to cause irreparable harm to RNN, as Shafer has access to RNN's confidential information and

retained/transmitted to her personal email account confidential and trade secret information prior to being terminated from RNN, which the evidence shows she has used at competitor AHS. Thus, this result is warranted given RNN's likelihood of success on the trade secret misappropriation claims and breach of the non-compete and confidentiality provision claims.

## V.    **Public Interest**

The fourth element requires that the injunction serve the public interest. *See Superior Consulting Servs*., 710 Fed. Appx. at 853. The public has an "interest in upholding and protecting freedom to contract and to enforce contractual rights and obligations." *Mohr v. Bank of New York Mellon Corp*., 393 Fed. Appx. 639, 646 (11th Cir. 2010). Additionally, "[t]he Florida Legislature has determined that injunctions to protect trade secrets and restrictive covenants serve the public interest." *Mulleavey*, 19-60833-CIV, 2019 U.S. Dist. LEXIS 170466, 2019 WL 4693575, at *5; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Silcox*, No. 01-8800-CIV, 2001 U.S. Dist. LEXIS 17241, 2001 WL 1200656, *6 (S.D. Fla. Oct.4, 2001) (same).

I find that the public interest will be served by the grant of the injunction described below. The issuance of a preliminary injunction under the facts at issue in this case would serve the public interest, which favors the enforcement of parties' contractual rights and obligations.  Shafer signed a valid contract in which she agreed not to compete with RNN and not to solicit RNN's nurses or misappropriate RNN's confidential information and trade secrets.  Thus, an inunction designed to protect this contract and RNN's information to prevent unfair competition surely serves the public interest. *See Silcox*, 01-8800-CIV-HURLEY/LYNCH, 2001 U.S. Dist. LEXIS 17241, 2001 WL 1200656, at *6. Even under Utah law, Utah courts have routinely upheld the enforceability of noncompetition and confidentiality agreements. *See, e.g., Kasco Servs. Corp. v. Benson*, 831 P.2d 86, 88 (Utah 1992) ("[A] covenant not to compete is necessary for the protection of the goodwill

of the business when it is shown that although the employee learns no trade secrets, he may likely draw away customers from his former employer, if he were permitted to compete nearby."); *Dixon*, 669 P.2d at 429-30 (reversing lower court's denial of motion for preliminary injunction to enforce non-compete agreement).  As demonstrated by RNN, this is precisely what Shafer has been doing – drawing nurse clients away from RNN and diverting them to AHS.  Although she no longer is employed by AHS, she has been vocal about her intent to secure new employment as a nurse recruiter with another competitor and is in the final stages of being hired as a nurse recruiter at a competitor.  Dec. Ruffy at ¶ 7 [D.E. 66].  Permitting Shafer to engage in this conduct does not serve the public interest.

Shafer argues that there is a public policy concern in enforcing the restrictive covenant where the enforcement would potentially affect the rendition of medical services, citing to *Scenic Aviation*.  *Scenic Aviation* holds that non-competition agreements are disfavored where the person being enjoined provides healthcare services to patients, and noted a specific public policy ensuring that persons have access to health care in remote areas:

> It is obvious that there is a compelling need for medical services in the remote locations served by Scenic. Eagle acknowledges it is the only air ambulance service operating out of Kayenta and Chinle, Arizona. Scenic admitted there is a "constant and critical need" for medical staff in the area at issue that the "public interest is served by having more, not fewer air ambulance services to respond to the emergency medical needs of the Navajo nation."

*Id*. at 22-23.  Shafer's argument is misplaced, as Shafer did not render medical services. She never provided healthcare services to patients, nor was she ever employed in the position of a nurse or any other type of healthcare practitioner.  Rather, Shafer found temporary jobs for travel nurses who provided medical services at healthcare facilities.  It is well settled that recruiter jobs like the one Shafer held at RNN are precisely the type of position for which restrictive covenants

are enforced in Utah. *See Kasco*, 831 P.2d at 88 (enforcing restrictive covenant against sales professional).

Thus, the public policy weighs in favor of RNN.

## VI.   **BOND**

Shafer has requested a bond in the amount of $615,000.  The Court finds that a bond here is not warranted.  Indeed, Shafer waived the right to request a bond in connection with any injunctive relief.  Plt. Ex. 2 at ¶ 10(c):

> Employee hereby expressly waives any and all right or requirements to prior notice or for security or the posting of any bond in connection with temporary injunctive relief or other such equitable or injunctive remedies on behalf of the Company.

Additionally, under Utah law, "the trial judge has wide discretion in the matter of requiring security and if there is an absence of proof showing a likelihood of harm, certainly no bond is necessary."  *See Continental Oil Co. v. Frontier Refin. Co.*, 388 F.2d 780, 782 (10th Cir. 1964).  In *Continental Oil*, the Tenth Circuit affirmed an injunction that did not require a bond because the non-moving party failed to demonstrate that a bond was warranted:

> The evidence shows that Frontier is a corporation with considerable assets and that it is able to respond in damages if Continental does suffer damages by reason of the injunction. We therefore cannot say that the court abused its discretion by not requiring a bond in this case.

*Id*. at 783.  Shafer argues, and RNN does not dispute, that RNN is a multi-million dollar company. Thus, RNN has assets to respond to damages, if Shafer is entitled to any damages as a result of the injunction, and a bond is not warranted.  Further, with respect to RNN's misappropriation claims, Shafer has not demonstrated that a bond is warranted.  Shafer has not shown what damages she believes she will suffer in connection to her requirement to return RNN's trade secrets.

## VII.    Scope of Relief

An injunction enjoining RNN from using, copying, disseminating, divulging, transferring, or communicating any of RNN's confidential information and trade secrets for any purpose and requiring the return of all RNN's information and trade secrets is warranted. An injunction enjoining Shafer from being employed by or otherwise rendering services to, for or on behalf of a company engaged in the nurse staffing business for the twelve (12) month restricted period  set forth in her Employment Agreement, commencing as of the date her employment with AHS ended (October 20, 2023), also is warranted. Pl. 2, ¶ 5; D.E. 46-1.

RNN also requests that this Court enter an Order requiring Shafer to turn over her personal laptop computer, cell phone, external hard drives and cloud storage accounts in her possession that reasonably could contain the confidential information and trade secrets at issue, to be imaged, searched and wiped pursuant to an agreed upon forensic protocol by an agreed upon third party forensic expert, at Shafer's expense. The DTSA authorizes this course of action in "exceptional circumstances." 18 U.S.C. § 1836(b)(2). RNN has demonstrated that exceptional circumstances are present here. Shafer testified not only that she still has the W&A Spreadsheets in her possession, she also has phone numbers of RNN's nurses in her personal cell phone.  Indeed, Shafer testified that she texted every nurse in her phone to let them know that she was no longer working at RNN and working with AHS.  Despite receiving multiple letters from RNN, Shafer refused to return RNN's information until her testimony on November 7, 2023.  Shafer testified that she did not know to what information RNN was referring in its letters, otherwise she would have returned the information.  Shafer never asked RNN for clarification and her ignorance, whether true or not, demonstrates exceptional circumstances.  Indeed, there remains a substantial risk that Shafer will not return RNN's confidential, trade secret information because she does not

want to or because she does not believe the information – like the nurse contact information in her phone – belongs to RNN.  Accordingly, exceptional circumstances exist for the relief sought against Shafer.

In conclusion, RNN has established all four prerequisites for a preliminary injunction. Thus, Plaintiff's motion for preliminary injunction is **GRANTED** to the extent that:

(a)  Shafer is enjoined from rendering services to, for or on behalf of any company that is engaged in the nurse staffing industry for the twelve (12) month restricted period, which, pursuant to the language of the Agreement, commences as of the October 20, 2023 date of her termination from AHS, when she ceased to be in violation of the non-compete provision, ending on October 20, 2024.

(b)  Shafer is enjoined from soliciting, recruiting, offering or otherwise providing or attempting to solicit, recruit, offer or provide nurse recruiting and/or staffing services to any nurse with whom she had contact during the last three years of her employment with RNN for the twelve (12) month restricted period ending October 20, 2024.

(c)  Shafer is enjoined from directly or indirectly, using, copying, disseminating, divulging, transferring, or communicating any of RNN's confidential information and trade secrets for any purpose.

(d)  Shafer is ordered to identify all copies and all transfers of the confidential information and trade secrets, including the identity of any third party to whom she transferred, provided or made available the confidential information and trade secrets or a copy thereof through a third-party forensic expert agreed upon by the Parties.

(e)  Shafer is ordered to return all of RNN's confidential and trade secret information in any form and delete and purge any such information currently in her possession, custody or

CASE NO.: 23-61703-CIV-SINGHAL/VALLE

control from all electronic devices in her possession, custody or control through a third-party forensic expert agreed upon by the Parties.

**(f)** Shafer is ordered to turn over her computers, cell phones, and all other Devices in her possession that reasonably could contain the confidential information and trade secrets at issue (including any of the following that might be on or about her possession: smart phones, tablets, desktop computers, laptop computers, and disks, memory files, flash drives, hard drives, and the like) and cloud storage accounts to be imaged, searched and wiped pursuant to a forensic protocol by an agreed upon third party forensic expert.

**(g)** Shafer is ordered to disclose to the agreed upon third-party forensic expert her passcodes and passwords to her personal gmail account where she sent RNN's confidential and trade secret information, and any other cloud storage accounts where the confidential information and trade secrets may be stored, so the accounts can be searched for RNN's confidential information and trade secrets, which would then be wiped by the forensic expert.

**(h)** Shafer is ordered to pay the costs for the forensic expert's services.

Dated: November 21, 2023

       Respectfully submitted,

       By: *s/ Jennifer A. Schwartz*
          Jennifer A. Schwartz, Esq.
          Florida Bar No. 502431
          E-mail: *jennifer.schwartz@jacksonlewis.com*
          Adam Schultz, Esq.
          Florida Bar No. 121111
          E-mail: *adam.schultz@jacksonlewis.com*
          JACKSON LEWIS P.C.
          One Biscayne Tower, Suite 2500
          Two South Biscayne Boulevard
          Miami, Florida 33131
          Telephone: (305) 577-7600
          *Counsel for the Plaintiff*

CASE NO.: 23-61703-CIV-SINGHAL/VALLE

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing document is being served on

November 21, 2023, on all counsel of record on the Service List below via transmission of Notices

of Electronic Filing generated by CM/ECF.

<u>*s/ Jennifer Schwartz*</u>
Jennifer Schwartz, Esq.

CASE NO.: 23-61703-CIV-SINGHAL/VALLE

## SERVICE LIST

John Cody Berman
Florida Bar No.: 58654
E-mail: *cody.german@csklegal.com*
Justin S. Maya, Esq,
Florida Bar No. 126087
E-mail: *justin.maya@csklegal.com*
Horancio Ruiz-Lugo, Esq.
Florida Bar No.:1048967
E-mail: *Horacio.Ruiz-Lugo@csklegal.com*
COLE, SCOTT & KISSANE, P.A.
Cole, Scott & Kissane Building
9150 South Dadeland Boulevard, Suite 1400
Miami, Florida 33256
Telephone: (786) 268-6415
Alternative Email:
*nicolle.quant@csklegal.com*
*Ieshia.ownes@csklegal.com*

*Counsel for Defendant AHS Staffing, Inc.*

Shlomo Y. Hecht, Esq.
Florida Bar No.: 127144
E-mail: *sam@hectlawpa.com*
SHOLMO Y. HECHT, P.A.
3076 N. Commerce Pkwy.
Miramar, Florida 33025
Telephone: (954) 861-0025

*Counsel for Defendant Rachel Shafer*

Jennifer Schwartz, Esq.
Florida Bar No.  502431
E-mail:  *Jennifer.schwartz@jacksonlewis.com*
Adam Schultz, Esq.
Florida Bar No. 121111
E-mail: *adam.schultz@jacksonlewis.com*
JACKSON LEWIS P.C.
One Biscayne Tower, Suite 3500
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 577-7600

*Counsel for Plaintiff*

Gregory Sconzo, Esq.
Florida Bar No.: 105553
Email: *greg@sconzolawoffice.com*
SCONZO LAW OFFICE, P.A.
3825 PGA Blvd., Suite 207
Palm Beach Gardens, Florida 33410

*Counsel for Defendant Lisley Rossi*

4857-0064-9104, v. 2