UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-61703-CIV-SINGHAL

CHG MEDICAL STAFFING, INC.
d/b/a RNNETWORK a Delaware
Corporation,

    Plaintiff,

v.

RACHEL SHAFER, an individual,
LISLEY ROSSI, an individual,
AHS STAFFING, LLC, an Oklahoma Limited
Liability Company,

    Defendants.
_____/

## ORDER

**THIS CAUSE** is before the Court upon Defendant Rachel Shafer's ("Shafer" or "Defendant") Motion to Dismiss (DE [35]).  In the Motion to Dismiss, Shafer seeks to dismiss Plaintiff CHG Medical Staffing, Inc.'s d/b/a RNNetwork ("RNN" or "Plaintiff") Complaint as it pertains to Shafer.  The Complaint asserts eight counts against Shafer, discussed in more detail below.  For the reasons set forth in this Order, the Motion to Dismiss is denied.[1]

    **I.**    **FACTS**

At their core, the facts in this case, as they pertain to Rachel Shafer, are relatively simple and straightforward.[2]  RNN works in the nursing staff industry and places nurses

---

[1] The Motion to Dismiss does not address the permanent injunctive relief sought in Count IX (Injunctive Relief).  This claim can thus proceed.  The Court addressed Count IX to the extent it sought preliminary injunctive relief in its Order on Preliminary Injunction (DE [144]).

[2] Defendant AHS Staffing, LLC did not file a motion to dismiss and instead filed its Answer on November 20, 2023. (DE [72]).  Defendant AHS Staffing, LLC then resolved its portion of the case. (DE [116]).  Plaintiff and Rossi also indicated that they had reached a settlement and they filed appropriate dismissal documents. (DE [116]).  In any event, since Shafer is the only Defendant seeking to dismiss the complaint under Rule 12, the Court will only recount the facts in this case as they pertain to her.

with temporary travel positions throughout the country. For many years, Shafer worked as a nurse recruiter for RNN. Her role consisted of maintaining relationships with nurse professionals while also ensuring that RNN's nurse professional clients were happily placed with temporary nursing positions. To help guide Shafer and the rest of its nurse recruiters as to where to place its nurse professionals with temporary positions, RNN developed a secure database of confidential and proprietary information. The database includes, for example, facility client and nurse provider lists; client and nurse preferences (e.g., the states they want to work in, preferred days, hours and rates), business strategies and models; pricing information; market research and analysis, and more (the "Confidential Information and Trade Secrets").

To help protect the confidentiality of the information contained in the database, RNN requires its employees to execute non-competition, non-solicitation, and confidentiality agreements as a condition precedent to employment and to being granted access to its Confidential Information and Trade Secrets. It is after all a negotiation. Shafer accepted the terms of the agreements and abided by them like all the other nurse recruiters ostensibly to receive a higher rate of pay. As a result, during the nearly eleven years that she worked at RNN, Shafer had unobstructed access to RNN's Confidential Information and Trade Secrets.

Shafer was one of the best, if not the best, nursing recruiter for RNN. For years she was one of its top producers placing a high number of nurses throughout the country. In 2022 alone, she generated over $6,000,000 in gross margins. Shafer was also compensated for her good work; in 2022 she took home over $615,000 in salary and commission.[3]

---

[3] How the litigants were unable to resolve their differences and have now litigated this matter in multiple forums for a year is above this Court's level of understanding and pay grade.

Given the mutually beneficial relationship and Shafer's success at the company, one would think that Shafer and RNN's relationship would be great, or at the very least amicable. That, however, was not the case. For reasons not clear to the Court—and potentially being litigated in state court—Shafer was terminated in March 2023. And based on an internal investigation conducted by RNN following her termination, RNN discovered that Shafer emailed to her personal email account, documents and spreadsheets containing RNN's Confidential Information and Trade Secrets. RNN maintains that this behavior, among others by Shafer, violates the confidentiality agreements that Shafer signed prior to her employment.

Within weeks after being fired, Shafer accepted a job with AHS as a Senior Healthcare Recruiter. RNN claims this violates the twelve-month non-competition agreement that Shafer signed prior to her employment. RNN also discovered instances where it claims Shafer was soliciting some of RNN's clients, which it argues violates the non-solicitation agreement that Shafer signed prior to her employment. As a result of these actions, RNN brought this suit against Shafer.

II.     **DISCUSSION**

In Shafer's Motion to Dismiss, she provides a series of arguments seeking to dismiss various Counts of RNN's Complaint. The Court will address each argument in turn. But before doing so, it is necessary to clarify which jurisdiction's laws will apply to each claim.

a.  **Choice of Law**

To begin this analysis, it is first necessary to discuss the Court's jurisdiction over this case. This case is before the Court via federal question jurisdiction, as RNN properly states a claim under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836(c). Since

RNN's state law claims arise out of the same operative facts as its federal trade secrets claims, the Court has supplemental jurisdiction over those claims.[4]

A federal court exercising supplemental jurisdiction over state-law claims applies the choice-of-law rules of the state in which it sits, in this case Florida. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). "Under Florida law, contractual choice-of-law provisions are presumptively enforceable." *Viridis Corp. v. TCA Glob. Credit Master Fund, LP*, 721 F. App'x 865, 873 (11th Cir. 2018) (citing *Default Proof Credit Card Sys., Inc. v. Friedland*, 992 So.2d 442, 444 (Fla. 3d DCA 2008)). A party may rebut this presumption "by showing that a provision contravenes the strong public policy of Florida or is unjust or unreasonable." *Id.*

The parties do not dispute that Shafer's employment agreement contains a choice of law provision. The provision states: "Employee and the Company agree that the validity, interpretation, construction, effect, and enforcement of this Agreement shall be governed by the laws of the State of Utah . . . ." (DE [1-2] ¶ 10(f)). Accordingly, and as the parties agree, Utah law applies to RNN's breach of contract claim.

The parties, however, dispute whether the choice of law provision applies to the rest of RNN's claims—claims that do not concern the enforcement of the employment agreement. The key inquiry here is whether the parties intended for the choice of law provision to apply to all disputes arising out of or related to the employment agreement or just disputes concerning its enforcement. If the former, the choice of law provision

---

[4] As the Complaint is alleged, the Court does not have diversity jurisdiction. Defendant AHS Staffing, LLC is a Limited Liability Company, but the Complaint fails to allege the citizenship of the LLC's members. *See Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004) (citizenship of an LLC includes citizenship of each member). Instead, the Complaint merely states that AHS Staffing, LLC "is an Oklahoma limited liability company, and at all times material, was registered and doing business in the State of Florida, engaged in substantial activity within the state of Florida." (DE [1] ¶ 2). Diversity jurisdiction, therefore, is not properly alleged.

would attach to the rest of RNN's claims. If the latter, it would just attach to RNN's breach of contract claims.

To resolve this dispute, it is, of course, important to start with the plain language of the provision: "the validity, interpretation, construction, effect, and enforcement of this Agreement" will be governed by Utah law. Notably, the language seems to limit the choice of law provision to claims concerning the employment agreement itself; it does not use broader language to denote that the provision should apply to all disputes between the parties. Thus, a plain reading of the choice of law provision is that Utah law should only apply to claims regarding the enforcement of the agreement, such as RNN's breach of contract claim, and not to RNN's other claims that relate to conduct outside the enforcement of the agreement.

Next we consider context which confirms that the parties intended to limit the choice of law provision solely to claims concerning the enforcement of the employment agreement. In the very same paragraph of the employment agreement that contains the choice of law provision, the parties used broader language in delineating that all disputes between the parties are to be litigated in Utah. Specifically, the clause states that "*any legal suit, action or proceeding* arising out of or relating to this Agreement shall be instituted exclusively in the courts of the State of Utah." (DE [1-2] ¶ 10(f)) (emphasis added). The parties use of broader language for the forum selection clause to apply to all disputes between the parties shows that the parties contemplated broader language for the choice of law provision but chose to limit its application solely to claims arising out of the employment agreement itself. *See Future Metals LLC v. Ruggiero*, 2021 WL 1701568, at *14 (S.D. Fla. Apr. 13, 2021) (finding the use of broader language elsewhere in the agreement manifests the parties' intent to limit the choice of law provision solely to

5

disputes arising out of the agreement). The Court has no power to deviate from the parties' intent absent a showing that the choice of law provision undermines a strong Florida public policy. Since Shafer does not establish such a showing, the Court will enforce the choice of law provision as it appears. Utah law will apply to RNN's breach of contract claim and Florida law will apply to its state and common law claims.[5]

### b. Breach of Contract

Count I of RNN's complaint asserts a breach of contract claim against Shafer. Three alleged breaches underlie this claim: (1) breach of a non-compete agreement, (2) breach of a confidentiality agreement, and (3) breach of a non-solicitation agreement. (DE [1] ¶ 114). Shafer only disputes the non-compete provision, all but conceding that RNN can proceed on Count I on the breach of confidentiality and breach of non-solicitation provisions. (DE [65] at 6) (RNN noting Shafer's concession of these two breaches). As to the non-compete, Shafer claims it should be dismissed because the geographic scope of the non-compete is too broad, nurse recruiting is a common calling, and non-competes in the healthcare industry are against public policy. The Court disagrees as to each of those reasons.

Shafer first argues that RNN's claim for breach of contract should be dismissed because the nationwide non-compete is "overbroad." Utah law, however, permits nationwide restrictive covenants. *See Sys. Concepts, Inc. v. Dixon*, 669 P.2d 421, 427 (Utah 1983) (finding that a non-compete covenant with unlimited geographic restriction was reasonable and enforceable where employer cable company had customers

---

[5] Though already discussed in a previous order, neither RNN, Shafer, nor Rossi have chosen to enforce the forum selection clause. (DE [45] at 2-3). Without any signatory to the employment agreement seeking to enforce the clause and venue being otherwise proper in this district, the Court is able to entertain this case.

nationwide). Here, RNN places nurses with temporary nursing positions throughout the country, so the geographical limitation is reasonable.

Supporting a finding of the reasonableness of the nationwide non-compete in Shafer's employment agreement is the narrow activity restriction accompanying it. Shafer is only prevented from working in the nurse recruiting industry; she is not prohibited from recruiting doctors, lawyers, accountants, engineers, pharmacists, and the like during the one-year restricted period. When the geographical scope is limited by a very narrow activity restriction, Utah courts generally find the limitation to be reasonable. *See, e.g.*, *Sys. W. Performance, LLC v. Farland*, 2015 WL 4920962, at *4 (D. Utah Aug. 18, 2015) ("[A]lthough the restrictive covenant in this case lacks a specific geographical limitation, it has been reasonably limited by certain activity restrictions. Consequently, this factor weighs in favor of the reasonableness and enforceability of the non-compete clause."). The Court finds no reason to deviate from that practice here.

Shafer next argues that the non-compete is unreasonable because it prevents her from engaging in a common calling. "Covenants not to compete which are primarily designed to limit competition or restrain the right to engage in a common calling are not enforceable." *Robbins v. Finlay*, 645 P.2d 623, 627 (Utah 1982). Common calling jobs are ones that do not require a unique, special, or extraordinary skill. *See id.* at 628. But when an individual with a common calling profession has access to confidential information, reasonable restrictive covenants can be enforced against that individual. *Scenic Aviation, Inc. v. Blick*, 2003 WL 26060445, at *7 (D. Utah Aug. 4, 2003).

Here, Shafer's job as a recruiter does not require any unique, special, or extraordinary skill as a recruiter. *See Robbins*, 645 P.2d at 628 (finding that a sales person does not typically possess unique, special or extraordinary skills). But, RNN has

7

alleged that Shafer had access to RNN's Confidential Information and Trade Secrets to assist her in placing nurses with temporary positions throughout the country. Because she had access to this information, RNN can enforce a reasonable restrictive covenant. *See Scenic Aviation*, 2003 WL 26060445, at *7.

Shafer last contends that the non-compete is unenforceable because there is a public policy against restrictive covenants that interfere with the delivery of medical services. Here, she claims RNN is seeking to limit the delivery of medical services; namely, providing nurses to healthcare facilities. It is true that Utah and other jurisdictions are concerned with the public policy ramifications of such restrictive covenants. *See id.* at *8 (collecting cases from other jurisdictions). But the cases in which Utah and those jurisdictions expressed that concern involved the limitations on doctors and emergency medical service providers themselves. Those cases did not concern the placement of such providers of medical services in healthcare facilities. Accordingly, there is no public policy against restrictive covenants of recruiters, and there is no public policy concern enforcing the restrictive covenant against Shafer. Shafer's Motion to Dismiss as to Count I is therefore denied.[6]

### c. Trade Secret Claims

Count II and Count III of RNN's complaint allege misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") 18 U.S.C. § 1836, and the Florida Uniform Trade Secrets Act ("FUTSA") Fla. Stat. § 688.001. Shafer argues these claims should be dismissed because there was no trade secret to misappropriate.[7] The Court disagrees.

---

[6] The Court is aware of the Federal Trade Commission's recent final rule that bans non-competition agreements nationwide. *See* 16 C.F.R. § 910. But since the rule does not take affect until September 4, 2024, the Court must enforce the provisions as the law stands today. RNN's non-competition agreement is reasonable and enforceable under the current Utah law.

[7] Shafer also contends that Count III (FUTSA) should be dismissed because Utah law governs. Since the Court has already explained that Florida law applies to this type of claim, Shafer's argument fails.

Shafer's chief argument as to RNN's trade secret claims is that RNN's alleged trade secret, an excel spreadsheet containing information about its nursing clients, is not a trade secret. She claims it is just a customer list assembled with information publicly available online, which courts have found insufficient to warrant trade secret status. *See* (DE [35] at 10-11) (citing *CDC Restoration & Const., LC v. Tradesmen Contractors, LLC*, 274 P.3d 317, 326 (Utah Ct. App. 2012). Notwithstanding Shafer's misplaced reliance on Utah law, RNN has sufficiently alleged that its spreadsheets are trade secrets.

RNN's Complaint alleges that its trade secrets consist of:

> [F]acility client and nurse provider lists; nurse contact and assignment information; client and nurse preferences; spreadsheets updated by numerous recruiters noting nurse preferences (e.g., the states they want to work in, preferred days, hours and rates), business strategies and models; pricing information; market research and analysis; leadership training, coaching and other employee development programs and methods; and cost control strategies.

(DE [1] ¶ 21).[8] These types of spreadsheets are routinely classified as confidential and as trade secrets. *See, e.g.*, *AutoNation, Inc. v. Mulleavey*, 2019 WL 4693575, at *3 (S.D. Fla. Aug. 22, 2019). Additionally, and contrary to Shafer's assertions in her motion to dismiss, the spreadsheets—as alleged—do not just contain information readily available on the internet. Instead, they contain, for example, client and nurse preferences, business strategies, pricing information, among other information that cannot be readily

---

[8] RNN also described the various spreadsheets that Shafer emailed herself prior to her termination as:

> Shafer emailed to her personal Gmail account numerous Working and Awaiting ("W/A") spreadsheets containing information pertaining to over 2000 nurses, such as their names, email addresses, specialties (e.g., RN-Pediatric ICU or Surgical or Emergency Room), date of their current placement, the state and location of their current placement, their shifts and hours per shift, the facility client where each nurse is working, bill rates, gross margins for each separate nurse placed, assignment end dates and durations, provider contact information, whether the contract was new, renewed or extended, and other information which would make it very easy for a staffing agency like AHS to solicit these providers from RNN.

(DE [1] ¶ 81).

9

gleaned from public sources. Since this information is not readily available on the internet, RNN's compilation of such information warrants trade secret protection at this stage of the case.

Even if Shafer is correct that all the information in RNN's spreadsheets could be compiled from the public domain, it can still qualify as a trade secret if the information has been located, distilled, and organized into an easily searchable Excel spreadsheet. *See, e.g.*, *Howmedica Osteonics Corp. v. Alphatec Spine, Inc.,* 2022 U.S. Dist. LEXIS 122945, 2022 WL 3136837, at *7 (M.D. Fla. June 17, 2022) ("This is because a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which in unique combination, affords a competitive advantage and is a protectable secret."). In other words, a significant investment in time, money, and effort in compiling the data and information for over 2,400 nurses can transform data otherwise available on the internet into a trade secret. *See id.* RNN's well-pleaded allegations claim it exerted this effort into its spreadsheet. RNN has therefore sufficiently alleged enough facts to show that its spreadsheets are trade secrets. Shafer's motion to dismiss as to RNN's trade secret claims is therefore denied.

### d. Preemption of RNN's Tort Claims.

Shafer next contends that RNN's common law tort claims are preempted by the Utah Trade Secrets Act ("UTSA") and Utah law. Since Florida law applies to these claims, the Court could readily dismiss Shafer's arguments because she does not argue in the alternative that the common law claims are preempted by FUTSA. But since FUTSA, for the most part, does not anyway preempt the common law claims, the Court will explain why.

FUTSA contains a preemption provision:

(1) Except as provided in subsection (2), ss. 688.001-688.009 displace conflicting tort, restitutory, and other law of this state providing civil remedies for misappropriation of a trade secret.
(2) This act does not affect:
   (a) Contractual remedies, whether or not based upon misappropriation of a trade secret;
   (b) Other civil remedies that are not based upon misappropriation of a *trade secret* . . .

Fla. Stat. §§ 688.008(1)-(2) (emphasis added).  Preemption is therefore proper if the other tort claims involve the same underlying factual allegations as the claim for trade secret misappropriation.  *Allied Portables, LLC v. Youmans*, 2016 WL 259548, at *3 (M.D. Fla. Jan. 21, 2016).  Preemption, however, does not apply when there are material distinctions between the wrongdoing alleged in the trade secret claim and the other claims seeking civil remedies.  *Id.*  A court examining whether preemption is appropriate is to "examine the allegations in each claim to see if they are separate and distinct from the FUTSA claim."  *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1180 (M.D. Fla. 2005).

Before examining the allegations underlying each claim, it is necessary to first understand the elements of a misappropriation claim.  A party can misappropriate another's trade secret by either acquisition, disclosure, or use.  *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1311 (11th Cir. 2020) (citing Fla. Stat. § 688.002(2)).  RNN alleges that Shafer misappropriated its trade secrets by acquisition and by use.  *See* (DE [1] ¶¶ 129-30).  A person misappropriates a trade secret "by acquisition" when he acquires it and "knows or has reason to know that the trade secret was acquired by improper means."  Fla. Stat. § 688.002(2)(a).  A person misappropriates a secret "by use" if he uses it "without express or implied consent" and either

1. Used improper means to acquire knowledge of the trade secret; or

11

    2. At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:
        a. Derived from or through a person who had utilized improper means to acquire it;
        b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
        c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
    3. Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Fla. Stat. § 688.002(2)(b).

Turning to RNN's actual misappropriation claims, RNN alleges Shafer misappropriated its trade secrets by acquisitions when "she acquired them through improper means, namely outright and flagrant theft and breach of their duties to maintain their secrecy." *See, e.g.*, (DE [1] ¶ 129). RNN alleges Shafer misappropriated its trade secrets by use because she "used improper means to acquire Confidential Information and Trade Secrets (namely theft and breach of their duties to maintain their secrecy)." *See, e.g.*, (DE [1] ¶ 130). In sum, RNN's misappropriation claims center on two wrongful acts: (1) Shafer's theft or improper acquisition of RNN's trade secrets, and (2) Shafer's failure to uphold her duty to maintain the secrecy of RNN's Confidential Information and Trade Secrets. The Court will now turn to each of RNN's common law claims to see if its allegations are separate and distinct from RNN's misappropriation claims. *See Am. Honda Motor Co.*, 390 F. Supp. 2d at 1180.

### i. Count IV: Conversion

RNN concedes that it pleads its conversion claim in the alternative to its misappropriation claims. Meaning, RNN concedes that its conversion claim would otherwise be preempted by its misappropriation claims, but claims that in the event that its misappropriation claims are to be dismissed at a later date, RNN's conversion claim

would no longer be preempted. Since the Federal Rules of Civil Procedure encourage alternative pleadings in this manner, *see* Fed. R. Civ. P. 8(d), it would be premature for the Court to dismiss Count IV at this time. Accordingly, at this time, the Court will not dismiss Count IV.

### ii. Count V: Breach of Fiduciary Duty

RNN's breach of fiduciary duty claim alleges that Shafer breached the following four duties: (1) to act in RNN's best interest, (2) to safeguard and protect RNN's trade secrets and confidential information, (3) to not use RNN's trade secrets and confidential information for her personal benefit, and (4) to not solicit RNN's clients to resign from RNN and seek reassignment through AHS (or another recruiting agency). *See* (DE [1]). Duties 1, 3, and 4 stem from conduct separate and distinct from RNN's misappropriation claims; they do not center on theft or failure to maintain RNN's trade secrets, but rather on Shafer's solicitation of RNN's clients and stealing business from RNN. Accordingly, to the extent Count V rests on those factual allegations, the claim is not preempted by FUTSA.

The duty to safeguard and protect RNN's trade secrets overlaps with RNN's misappropriation claim that Shafer failed to uphold her duty to maintain the secrecy of RNN's Confidential Information and Trade Secrets. To the extent Count V therefore rests on that allegation, it would be prevented. But since RNN is permitted to plead alternative claims, like with RNN's civil conversion claim it would be premature to dismiss this portion of Count V at this time.

### iii. Count VI: Civil Conspiracy.[9]

RNN's civil conspiracy claim alleges that Shafer "committed several unlawful and overt acts, including misappropriating RNN's Confidential Information [a]nd Trade Secrets and soliciting several nurses to cease their relationship with RNN and instead to do business with AHS." (DE [1] ¶ 162). RNN's allegations that rely on the Defendants soliciting several nurses are separate and distinct from the misappropriation claims. Thus, to the extent Count VI rests on Defendants overt act to solicit RNN's clients to do business elsewhere, it survives FUTSA preemption.

The portion of Count VI that rests on Shafer's alleged misappropriation of confidential information is preempted since it relies on the same factual conduct underlying RNN's trade secrets claim. But again, it would be premature to dismiss this portion of Count VI at this time.

### iv. Count VII: Tortious Interference with Advantageous Business And Contractual Relationships.

RNN's tortious interference claim alleges, at its core, that Shafer "intentionally and unjustifiably interfered with RNN's contractual and business relationships with its nurse clients by inducing them to and/or assisting them to quit their placements secured through RNN and/or choosing not to continue doing business with RNN and instead to do business with Shafer and Rossi at AHS." (DE [1] ¶ 174). This claim has nothing to do with misappropriation of trade secrets but rather focuses on Shafer's alleged improper solicitation of RNN's clients. Accordingly, Count VII rests on allegations separate and distinct from RNN's misappropriation claims and is not preempted by FUTSA.

---

[9] The Court acknowledges that RNN does not explain why the civil conspiracy claim is not preempted by FUTSA, which should otherwise procedurally default the claim. But since the Court is not procedurally defaulting Shafer's arguments that the civil claims are preempted by FUTSA, the Court will not do so here.

### e. Economic Loss Rule

Shafer last argues that RNN's common law claims, to the extent they survive UTSA preemption, are preempted by Utah's economic loss rule. As discussed above, Florida law applies, and even though Florida also has an economic loss rule, it nevertheless does not preempt RNN's common law claims.

The economic loss rule is a "judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Companies, Inc.*, 110 So. 3d 399, 401 (Fla. 2013). The Florida Supreme Court has explained that the economic loss rule is limited to product liability cases. *Id.* at 400. Since Shafer does not cite to, and the Court is also not aware of, any more recent opinion from the Florida Supreme Court that calls that holding into question, the economic loss rule has no application in this case. It therefore does not preempt any of RNN's common law claims. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Shafer's Motion to Dismiss (DE [35]) is **DENIED**.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 31st day of July 2024.

*[signature]*
RAAG SINGHAL
UNITED STATES DISTRICT JUDGE

Copies furnished counsel via CM/ECF